**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| 12273977 CANADA INC., a Canada corporation,<br><br>Plaintiff,<br><br>v.<br><br>CS GLOBAL ENERGY US INC., f/k/a LAKE PARIME USA INC., a Washington corporation,<br><br>Defendant. | CASE NO. 25-1630<br><br>**COMPLAINT**<br><br>JURY DEMAND |

Plaintiff 12273977 Canada Inc. brings this action for breach of contract, unjust enrichment, replevin, conversion, and trespass to chattels and alleges as follows:

## I. PARTIES

1. Plaintiff 12273977 Canada Inc. is a Canadian corporation with its principal place of business in Toronto, Ontario, Canada.

2. Defendant CS Global Energy US Inc., formerly known as Lake Parime USA Inc., is a Washington corporation with its principal place of business in Spokane, Washington. Defendant is the successor in interest to Lake Parime USA Inc.


MCDERMOTT WILL &SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), as the parties are diverse in citizenship and the amount in controversy exceeds $75,000.

4. Venue in this Court is proper under Section 16.1 of the parties' Co-location Agreement, dated June 16, 2022, and as amended, in which the parties agreed that "[a]ny dispute relating in any way to . . . this Agreement will only be adjudicated in a state or federal court located in King County, Washington." Each party also consented to exclusive jurisdiction and venue in these courts and under Section 3.a of the parties' Termination Agreement, dated May 2, 2025, which states that "both parties hereby irrevocably attorn to the jurisdiction of the Courts of King County, Washington with respect to any matter relating to this amendment."

5. This Court has personal jurisdiction under RCW 4.28.180 and under Federal Rule of Civil Procedure 4, because Defendant is a citizen of Washington State, and because Defendant consented to personal jurisdiction via the agreement provisions quoted above.

## III. FACTUAL ALLEGATIONS

### A. Background on Cryptocurrency and Bitcoin Mining

6. The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," "digital assets," "coins," and "tokens." Cryptocurrencies are digital assets that hold value and can be used to buy goods and services. Bitcoin or "BTC" was the first and is currently the most popular cryptocurrency.

7. All cryptocurrencies exist on a "blockchain." A blockchain is an open-sourced string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.

8. All transactions are recorded on the blockchain and are publicly available. When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are validated in batches of transactions, called "blocks."



MCDERMOTT WILL &SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

9. Those "blocks" are publicly available and reflect all the cryptocurrency transactions that occurred on the blockchain at a particular point in time. Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain" – hence the name.

10. Bitcoin is a decentralized, open-source, and peer-to-peer cryptocurrency which requires validation of transactions. No single central authority controls the supply of, or validates transactions involving bitcoin. Instead, these functions are widely distributed to the participants of the Bitcoin network.[1]

11. The process by which bitcoin is created and bitcoin transactions are validated is referred to as "mining." Cryptocurrency miners utilize high-powered computers, commonly referred to as "rigs," which devote computer power to solve complex cryptographic puzzles on the Bitcoin network. Once a miner solves the cryptographic puzzle, it will have validated a bitcoin transaction and created a new block in the blockchain.

12. To incentivize participation in the validation of bitcoin transactions, miners who validate transactions are rewarded with newly-minted bitcoin. Currently, the reward for mining one block is 3.125 bitcoin.

13. Bitcoin was designed with scarcity as a central feature. There is a finite amount of bitcoin available in the market and available to be mined. Consistent with this notion of scarcity and to guard against inflation, the Bitcoin network is designed to execute a periodic Bitcoin-"halving" event in which the reward for mining one block is reduced by half, while mining expenses remain the same. The most recent Bitcoin halving occurred in or around April 2024.

14. Bitcoin mining is an extremely competitive and difficult industry in which to operate.

15. For mining rigs to mine bitcoin, they require an internet connection and electricity. As the rewards for bitcoin mining decrease, mining requires increasing amounts of computational

---

[1] The capitalized "Bitcoin" is used to refer to the Bitcoin network or software protocol, and "bitcoin," without capitalization, is used to refer to units of the cryptocurrency.



MCDERMOTT WILL &SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

power. Thus, the amount of electricity, the speed of an internet connection, and the price for which these services can be obtained are key considerations in the bitcoin mining industry.

16. Entire facilities have been constructed to house large numbers of mining rigs dedicated to mining cryptocurrencies continuously.

17. Facility operators are responsible for monitoring electricity costs, providing the facility with the appropriate temperature for rigs to operate, and ensuring that rigs maintain internet connectivity to participate in cryptocurrency mining.

18. Because of the difficulty in mining bitcoin, the bitcoin mining industry has seen the rise of "co-location" arrangements whereby a facility operator will lease space in its facility to multiple owners of bitcoin mining rigs who store their rigs at one facility to receive electricity and an internet connection.

**B. The Parties' Agreements**

19. Defendant operates a cryptocurrency mining facility in Coshocton, Ohio (the "Facility").

20. On or around June 16, 2022, Plaintiff and Defendant entered the Co-location Agreement under which Plaintiff leased space in the Facility. The Co-location Agreement provides that Plaintiff would install its cryptocurrency mining rigs in the Facility, and Defendant would supply them with electrical power, internet, and water for temperature maintenance purposes. A true and complete copy of the Co-location Agreement is attached hereto as **Exhibit 1**.

21. On or around June 24, 2022, the parties entered into an Amendment to the Co-location Agreement, a true and complete copy of which is attached hereto as **Exhibit 2** (together with Exhibit 1, the "Co-location Agreement").

22. In accordance with the terms of the Co-location Agreement, Plaintiff paid Defendant a security deposit of $1,633,824 (the "Security Deposit").

23. Under the Co-location Agreement, Defendant supplied electricity to Plaintiff's mining rigs for 7.75 cents ($0.0775) per kilowatt-hour. Ex. 2 § 2. Plaintiff would pre-pay for


MCDERMOTT WILL &SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

electricity in advance based on an estimate of minimum power usage and received credits or additional payment obligations based on a reconciliation of the estimates against actual power use. As such, the balance owed on an invoice issued by Defendant in each month included prepayment for hosting services to be provided two months in the future.

24. The Co-location Agreement has a five-year term, which automatically renews for successive one-year terms unless terminated earlier upon written notice. Ex. 1 §§ 1.1, 4.1-4.3. In the event of a termination, "all amounts owing to a Party will be settled by the other Party, including the return of the Security Deposit, if applicable." *Id.* § 4.4.

25. Plaintiff installed its mining rigs in the Facility and supplied its own industrial-grade power cables to plug them into Defendant's power supply in the Facility. Attached as **Exhibit 3** is a true and complete copy of the June 2022 invoice to Plaintiff evidencing Plaintiff's purchase of the power cables.

26. Plaintiff paid all amounts owed to Defendant under the terms of the Co-location Agreement.

27. On April 28, 2025, Defendant issued Invoice No. SI-229, a true and complete copy of which is attached hereto as **Exhibit 4**. Invoice No. SI-229 included a prepayment of $558,000 for hosting services to be provided in June 2025.

28. Following the issuance of Invoice No. SI-229, Defendant informed Plaintiff that Defendant wished to terminate the Co-location Agreement early. Plaintiff was agreeable to an early termination.

29. On May 2, 2025, the parties entered a Termination Agreement. A true and complete copy of the Termination Agreement is attached as **Exhibit 5**.

30. As part of its obligations under the Termination Agreement, Plaintiff agreed to settle Invoice No. SI-229. Ex. 5 § 2(a).

31. On April 30, 2025, Plaintiff paid Invoice No. SI-229 in full, via payment of USDC stablecoin to Defendant's Ethereum wallet.[2] Defendant's representative confirmed payment in full of the amount owing that invoice. Below is a screenshot of that part of the parties' email exchange.

RE: Invoice SI-229

NW Nicholas Weiling Laursen
To Sarah McGeeney; treasury
Cc Dorottya Posfay;
Jesper Øhlenschlager; **+2 others**
4/30/2025

**EXTERNAL SENDER**

Hello Sarah,

Yes, I can confirm that we have received the balance, thank you,

**Nicholas Weiling Laursen**
Chief of Staff
CS GLOBAL ENERGY

CSGLOBALENERGY.COM
MOBILE +44 (0) 7931 579463
MOBILE +45 2119 8915

CS GLOBAL ENERGY LTD.
METROPOLITAN WHARF
LONDON E1W 3SS
UNITED KINGDOM

32. Further, under the Termination Agreement, the parties released each other from their respective obligations under the Co-location Agreement as of June 20, 2025, and also agreed (among other things) as follows:

a. Plaintiff would remove its mining rigs from the Facility by June 20, 2025. Ex. 5 § 2(b).

b. Defendant would return Plaintiff's Security Deposit. *Id.* § 2(c).

c. Defendant would provide Plaintiff with a $500,000 USD credit toward service fees and hosting fees owed by Plaintiff, up to the date it removed its mining equipment from the Facility, "after true-up of any applicable credits." *Id.* § 2(d).

---

[2] https://etherscan.io/tx/0x31c3a7f7083316bbdaa3b9776d2508ced4e1f72e1cab8f4d5ece67a4a420bf4f



MCDERMOTT WILL &SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

d. Plaintiff would provide Defendant with an agreed upon exit payment of $105,000 to cover cost of de-racking and packaging its mining equipment. *Id.* § 2(e).

33. By June 19, 2025, Plaintiff had removed its mining equipment (other than the power cables, which Defendant continues to unlawfully withhold) from the Facility and had satisfied its obligations under the Termination Agreement.

34. However, Defendant has yet to return Plaintiff's Security Deposit or pay the $500,000 termination credit, less $105,000 for agreed upon exit payments.

35. In addition, Defendant has not returned Plaintiff's $558,000 prepayment for June 2025 services that Plaintiff never received, nor has Plaintiff received Defendant's reconciliation for energy it prepaid $576,000 for May 2025 services. Attached hereto as **<u>Exhibit 6</u>** is a true and complete copy of an invoice dated March 24, 2025 from Defendant showing the prepayment of $576,0000 for May 2025.

36. Plaintiff has also demanded the return of its power cables, which Defendant has refused to return.

37. In response to Plaintiff's attempts to obtain what it is owed, Defendant initially responded by demanding that, as a condition of payment, Plaintiff submit certain documentation and authorizations, which are not required under either the Co-location Agreement or the Termination Agreement. Plaintiff nonetheless provided the requested documentation.

38. To date, notwithstanding Plaintiff having provided the requested documentation, Defendant has not made the payments that are owed to Plaintiff or returned Plaintiff's power cables.


MCDERMOTT WILL &SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

## IV. CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

39. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

40. Plaintiff and Defendant are parties to the Co-location Agreement and the Termination Agreement, both of which are valid contracts that required Defendant to return Plaintiff's security deposit and to credit Plaintiff for unused power for which it had pre-paid, or for which the parties' reconciliation process indicates that Plaintiff had overpaid.

41. Plaintiff has fully performed its obligations under the Agreement.

42. Defendant has breached the Agreement by withholding the security deposit and failing to credit Plaintiff for amounts that Plaintiff prepaid, or by which it overpaid, as described above.

43. As a direct and proximate result of Defendant's breach, Plaintiff has suffered damages in an amount to be proven at trial but are no less than $2,586,824, calculated as follows:

| | |
|---|---|
| Security Deposit | $1,633,824 |
| Service Fee Credit | $500,000 |
| Prepayment for June 2025 | $558,000 |
| Agreed Exit Payment | ($105,000) |
| | $2,586,824 |

### COUNT II – UNJUST ENRICHMENT

44. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

45. Plaintiff conferred a benefit upon Defendant in the form of a security deposit and amounts prepaid for services under the Co-location Agreement.

46. Defendant had an appreciation of and knowledge of this benefit, in that Defendant received these monies from Plaintiff and continues to possess them.

47. Plaintiff never used the services for which it made the prepayments in question. Plaintiff is also entitled to return of its security deposit.


MCDERMOTT WILL &SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

48. Thus, Defendant's acceptance or retention of the benefits described above without payment to Plaintiff of the same is unjust under the circumstances and those benefits should be disgorged.

## COUNT III – REPLEVIN

49. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

50. Plaintiff is the owner of the power cables and is rightfully entitled to possession of them as Plaintiff's personal property.

51. Plaintiff has demanded return of the power cables and Defendant has refused.

52. The power cables have not been taken for a tax, assessment, or fine under a statute and have not been seized under an execution or attachment against Plaintiff's property.

53. Accordingly, Plaintiff prays for an order directing return of its power cables.

## COUNT IV (IN THE ALTERNATIVE) – CONVERSION

54. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

55. Plaintiff has a property interest in the power cables and is entitled to their immediate possession.

56. As described above, Plaintiff has demanded return of the power cables and Defendant has refused to surrender possession of them.

57. Defendant is wrongfully denying Plaintiff of its interest in the power cables by refusing to return or otherwise allow Plaintiff to recover them.

58. Plaintiff's power cables are valued at approximately $63,000.

59. As a proximate and direct result of Defendant's conversion, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to costs incurred to recover or replace the property at issue.


MCDERMOTT WILL &SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

60. Unless Defendant returns the power cables, Plaintiff will continue to suffer irreparable harm for which it is entitled to preliminary and permanent injunctive relief.

### COUNT V (IN THE ALTERNATIVE) – TRESPASS TO CHATTELS

61. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

62. Defendant deprived Plaintiff of its use or possession of its property by refusing to allow Plaintiff to retrieve its power cables.

63. Defendant intended to interfere with Plaintiff's property interests in the power cables. Defendant's mental state in this regard is evident from, among other things, its failure to let Plaintiff recover the power cables after being put on notice that Plaintiff owns them and was demanding their return.

64. Defendant was unjustified in interfering with Plaintiff's possession of the power cables.

65. As a proximate and direct result of Defendant's conduct, Plaintiff has suffered damages in an amount to be proven at trial.

## V. REQUEST FOR RELIEF

Plaintiff respectfully asks this Court to grant the following relief:

A. Enter judgment in favor of Plaintiff and against Defendant:

a. granting all monetary and other remedies sought herein; and

b. entering equitable relief to recover Plaintiff's power cables;

B. Award Plaintiff all costs and expenses incurred in this action, including attorneys' fees to the extent allowed by court rules, applicable law, or agreement of the parties;

C. Award Plaintiff pre- and post-judgment interest, as allowed by law; and

D. Award Plaintiff such other and further relief as the Court deems just and equitable.


MCDERMOTT WILL &SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

DATED: August 26, 2025

Respectfully submitted,

**MCDERMOTT WILL & SCHULTE LLP**

By: *s/ Daniel-Charles V. Wolf*
Daniel-Charles V. Wolf, WSBA #48211

444 W. Lake St., Ste. #4000
Chicago, IL 60606-0029
(312) 372-2000
dcwolf@mwe.com

Andrew Kratenstein, TO APPLY *PRO HAC VICE*
Chenjia Zhu, TO APPLY *PRO HAC VICE*
One Vanderbilt Avenue
New York, NY 10017-3852
(212) 547-5400
akratenstein@mwe.com
chenjiazhu@mwe.com

*Attorneys for Plaintiff*
*12273977 Canada Inc.*