# Exhibit 1

# CO-LOCATION AGREEMENT

between

**LAKE PARIME USA INC.**

and

**12273977 CANADA INC.**

## CONTENTS


| Clause | Heading | Page |
|---|---|---|
| 1 | DEFINITIONS AND INTERPRETATION | 1 |
| 2 | LICENSED SPACE | 5 |
| 3 | PERMISSIBLE USES AND SERVICES | 6 |
| 4 | COMMENCEMENT, CONDITIONS PRECEDENT AND TERM | 8 |
| 5 | HOSTING FEE AND SECURITY DEPOSIT | 8 |
| 6 | ADDITIONAL CLIENT OBLIGATIONS | 9 |
| 7 | ALTERATIONS, ADDITIONS AND IMPROVEMENTS | 10 |
| 8 | ASSIGNMENT AND OTHER DEALINGS | 11 |
| 9 | LIABILITY | 12 |
| 10 | INDEMNIFICATION | 12 |
| 11 | INSURANCE | 13 |
| 12 | CONFIDENTIALITY | 13 |
| 13 | CLIENT PROPERTY | 14 |
| 14 | DEFAULT | 15 |
| 15 | FORCE MAJEURE | 15 |
| 16 | GOVERNING LAW AND DISPUTE RESOLUTION | 16 |
| 17 | NOTICES | 16 |
| 18 | GENERAL | 17 |
| SCHEDULE 1 | | 19 |
| SCHEDULE 2 | | 21 |

This Agreement is made on: 16th June, 2022

**BETWEEN**:

(1) **LAKE PARIME USA INC.**, a company incorporated and registered in the state of Washington, USA whose registered office is at 522 W RIVERSIDE AVE, STE 4212, SPOKANE, WA, 99201-0580, UNITED STATES ("**Lake Parime**"); and

(2) **12273977 CANADA INC.**, a company incorporated and registered in Canada with corporation number 1227397-7 whose business office is at Suite 4260, 181 Bay Street, Toronto, Ontario M5J 2V1 ("**Client**").

**BACKGROUND**:

(A) Lake Parime and **Standard Power Hosting Infra Company LLC**, formed and registered in Delaware, USA ("**Energy Company**") had previously entered into an agreement pursuant to which Energy Company provides certain energy services to Lake Parime in connection with Lake Parime's installation and operation of HPC Facilities at 500 N, 4th Street, Coshocton, Ohio 43812 (the "**Location**");

(B) Lake Parime has an exclusive lease for co-location space at the Location (the "**Lake Parime Co-Location Space**") together with the land upon which the Lake Parime Co-Location Space is located (the "**Property**"), jointly to be referred to as the "**Facility**", including without limitation the right to the provision of power and utility support services in the Lake Parime Co-Location Space and the right to grant for use of the Lake Parime Co-Location Space and use of such services within the Lake Parime Co-Location Space to third parties;

(C) Client desires to locate HPC Facilities at the Location within the Lake Parime Co-Location Space and receive certain power and utility services to support its mining of digital assets ("**HPC Operations**") at the Location;

(D) Lake Parime desires to license a portion of the Lake Parime Co-Location Space to Client (the "**Licensed Space**") and provide Client with water, internet service and up to ten (10) Megawatts of electrical power under the terms, covenants and conditions hereinafter set forth in this Agreement.

**IT IS AGREED** as follows:

## 1 DEFINITIONS AND INTERPRETATION

1.1 In this Agreement the following words shall have the following meanings:

"**Affiliate**" means, in respect of a person, any person or entity that, at any time during the Term, directly or indirectly controls, is controlled by, or is under common control with such

person, where "**control**" means: (i) direct or indirect ownership of fifty percent (50%) or more of the equity or the voting rights of that person; (ii) the possession, directly or indirectly, of the power to control the composition, appointment or removal of fifty percent (50%) or more of the directors, trustees or other governing body of that person; or (iii) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of that person, whether through ownership of voting securities, by contract or otherwise;

"**Agreement**" means this agreement, including the schedules;

"**Business Day**" means a day, other than a Saturday, Sunday or public holiday in the United States, when banks in the United States are open for business;

"**Client Default**" means any event of default set forth in clause 14 where Client is the defaulting Party;

"**Confidential Information**" means in relation to each Party any information relating to the business, financial affairs, products, services, property, equipment, operations, research, or processes of such Party and/or its Affiliates and includes, without limitation, data, know-how, software, computer programs, photographs, processes, models, specifications, intellectual property (whether existing before or developed after this Agreement including, without limitation, patents, copyright and other works of authorship in any form, trademarks, service marks, registered designs and any and all applications therefore) or any other material bearing or incorporating such information in any form (including, but not limited to, oral, written, graphic or electromagnetic form) including, without limitation, information which is labelled as confidential by the Disclosing Party at the time of delivery to the Receiving Party;

"**Disclosing Party**" has the meaning given in clause 12.1;

"**Effective Date**" means the date of this Agreement;

"**Force Majeure Event**" means an event, circumstance or cause beyond the relevant Party's reasonable control (provided always that lack of funds, insolvency or late payment shall not (howsoever caused) be an event, circumstance or cause beyond that Party's reasonable control), including:

(a) acts of God, flood, drought, earthquake or other natural disaster;

(b) epidemic or pandemic;

(c) terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations;

(d) nuclear, chemical or biological contamination or sonic boom;

(e) any law or any action taken by a government or public authority, including imposing an export or import restriction, quota or prohibition;

(f) collapse of buildings, fire, explosion or accident; and

(g) any labor or trade dispute, strikes, industrial action or lockouts (other than in each case by the Party seeking to rely on clause 15, or Affiliates of that Party);

"**Initial Period**" means a period of 5 years commencing after the Effective Date;

"**Interest Rate**" means the lesser of (i) Federal Reserve base rate (or such reasonable comparable national banking institution as agreed by the Parties in the event Federal Reserve ceases to exist or publish base rate), or (ii) the highest rate permitted by applicable laws, which means statutes, laws, ordinances, orders, or other rules, regulations or requirements from any government authority, now in force or which may hereafter be enacted or promulgated, as all of the same may be amended and supplemented from time to time ("**Laws**");

"**HPC Facilities**" means the digital asset mining computers of the Client to be located at the Licensed Space, set forth in Section 2 as detailed in Schedule 2;

"**Party**" means each of Lake Parime and Client, "**Parties**" means all or any combination of them (as the context requires);

"**Receiving Party**" has the meaning given in clause 12.1;

"**Renewal Period**" means each successive 12-month period after the Initial Period for which this Agreement is renewed;

"**Term**" means the Initial Period together with all Renewal Periods;

"**Virus**" means any program which contains malicious code or infiltrates or damages a computer system without the owner's informed consent or is designed to do so or which is hostile, intrusive or annoying to the owner or user and has no legitimate purpose.

1.2 In this Agreement, except to the extent that the context requires otherwise:

(a) the schedules form part of this Agreement and shall have effect as if set out in full in the body of this Agreement, and any reference to this Agreement includes the schedules;

(b) references to paragraphs or clauses are references to such provisions of this Agreement;

(c) use of the singular shall include the plural and vice versa. Words denoting any gender shall include any other gender;

(d) headings are for ease of reference only and shall not affect the interpretation of provisions thereunder;

(e) a reference to an enactment, instrument or statutory provision shall include a reference to any subordinate legislation made under the relevant enactment, instrument or statutory provision and is a reference to that enactment, instrument, statutory provision or subordinate legislation as from time to time amended, modified, incorporated or reproduced and to any enactment, instrument, statutory provision or subordinate legislation that from time to time (with or without modifications) re-enacts, replaces, consolidates, incorporates or reproduces it;

(f) references to an agreement, deed, instrument, licence, code or other document (including this Agreement), or to a provision contained in any of these, shall be construed, at the particular time, as a reference to it as it may then have been amended, varied, supplemented, modified, suspended, assigned or novated;

(g) the language which governs the interpretation of this Agreement is the English language. All notices to be given by any Party and all other communications and documentation which are in any way relevant to this Agreement or the performance or termination of this Agreement, including any dispute resolution proceedings, shall be in the English language;

(h) a reference to a "day" means a calendar day and to a "month" means a calendar month and to a "year" means a calendar year;

(i) the words "include" and "including" are to be construed without limitation;

(j) a reference to a Party includes its successors in title, permitted assigns, permitted subcontractors, and permitted transferees;

(k) a reference to a "person" includes any person, firm, company, government, state or agency of a state, or any association, foundation, trust, not for profit entity or partnership (whether or not having separate legal personality) or two or more of the foregoing and words denoting natural persons include any other persons;

(l) a reference to “writing” or “written” includes any modes of reproducing words in any legible form and shall include email except where expressly stated otherwise, and expressions referring to "writing" or "written approval" are to be construed accordingly;

(m) any sum payable by one Party to another Party shall be exclusive of taxes, fees, duties, and other governmental charges, which shall where it is chargeable be paid in addition to the sum referred to in this Agreement; and

(n) if there is an inconsistency between any of the provisions in the main body of this Agreement and the schedules, the provisions in the main body of this Agreement shall prevail.

**2 LICENSED SPACE**

2.1 Subject to the terms, covenants and conditions hereinafter set forth in this Agreement, Lake Parime hereby licenses to Client a portion of the Lake Parime Co-Location Space (a site plan of which is set forth in **Error! Reference source not found.**) and grants the non-exclusive right to use the access areas, elevators, parking areas, building risers, conduits, and similar areas and facilities on the Property but outside the Licensed Space (the "**Common Areas**") for the purposes for which they were intended.

2.2 Pursuant to this Agreement, Client has the right to:

(i) locate within the Licensed Space, the HPC Facilities; and

(ii) access site amenities including water and internet and up to ten (10) Megawatts of electrical power subject to the provisions of clause 3.8 (the "**Utility Services**").

The Parties acknowledge the HPC Facilities are scheduled to arrive on the dates and in the amounts set out in Schedule 2.

2.3 **Security.** Lake Parime shall ensure that security procedures and security measures are used and maintained as may be necessary according to the industry best practice, based upon the circumstances present within the Lake Parime Co-Location Space, to ensure the safety and security of the HPC Facilities, so as to avoid interruption of access, power or internet to the Licensed Space and use by Client of the HPC Facilities, including but not limited to theft of all or any portion of the HPC Facilities, damage to any of the HPC Facilities, unauthorized access to, use of, or interference with the HPC Facilities, or other such acts which could adversely affect or otherwise harm operations.

2.4 **Lake Parime Access to Licensed Space.** Lake Parime (and Lake Parime's agents, representatives and subcontractors reasonably approved by Client) will be entitled to access the Licensed Space at any time. Any entry into the Licensed Space in accordance with this Agreement shall not be deemed to be a forcible or unlawful entry into, or a detainer of, the Licensed Space, or an actual or constructive eviction of Client from any portion of the Licensed Space. Lake Parime will use commercially reasonable good faith efforts to minimize interference with Client's use of the Licensed Space.

2.5 **Limitation on Access, Monitoring and Inspection of Traffic.** Lake Parime will not either directly or indirectly: (i) access, manipulate or use, for itself or on behalf of any third party, the HPC Facilities or any content or traffic transmitted over Client's network facilities or (ii) knowingly allow any third party, other than governmental authorities with appropriate jurisdiction pursuant to a validly issued subpoena (or an equivalent document or authority in the applicable jurisdiction), to access, directly or indirectly, any content or traffic transmitted over Client's network facilities. In addition, Lake Parime will not, and will not knowingly allow any third parties to, use or access the HPC Facilities or any access points or technological devices on Client's network facilities. If a governmental authority requests access to or use of the Licensed Space or of content or traffic transmitted over Client's network facilities pursuant to a validly issued subpoena (or an equivalent document or authority in the applicable jurisdiction), Lake Parime will notify Client at the earliest opportunity.

**3 PERMISSIBLE USES AND SERVICES**

3.1 Client shall have the right to use the Licensed Space for HPC Operations and ancillary maintenance ("**Permitted Use**").

3.2 **Material Changes.** If at any time during the Term, Client wishes to replace or materially change the HPC Facilities (other than customary maintenance, repairs or replacement of obsolete equipment), Client shall seek Lake Parime's approval for such changes in advance (which shall not be unreasonably withheld).

3.3 **Control of HPC Facilities.** The HPC Facilities shall remain the sole and exclusive property of Client with right of replacement or removal at all reasonable times (provided such actions do not conflict with any obligations Client has to Lake Parime under this Agreement and do not prevent Lake Parime from fulfilling its obligations to Client under this Agreement), and nothing contained herein shall give or convey to Lake Parime any right, title or interest whatsoever in and to the HPC Facilities.

3.4 **As-Is Condition.** By entering into this Agreement, Client represents that it is fully familiar with the physical condition of the Lake Parime Co-Location Space, and all of its improvements, fixtures, and applicable equipment, as are reasonably apparent or foreseeable, and Client takes its license to use all of the same in "as-is" condition. Unless otherwise stated in this Agreement, Lake Parime has made no representations whatsoever in connection with the condition of the Lake Parime Co-Location Space or any of the improvements, fixtures or equipment on the Lake Parime Co-Location Space. Notwithstanding the forgoing, Lake Parime covenants to maintain the Lake Parime Co-Location Space in at least the state in which it is in on the Effective Date.

3.5 **Non-Interference.** Client acknowledges that except for the rights expressly granted pursuant to this Agreement it is not entitled, and does not have a license, to access any

other space or facilities within the Lake Parime Co-Location Space or the Property. Client covenants to, at all times, and to cause its employees, agents, contractors, subcontractors, permitted licensees, permitted sub-licensees, and permitted co-locators to at all times, take all necessary precautions and actions to ensure that no damage to any other than Client's equipment results from Client and its Affiliates or its employees', agents', contractors', subcontractors', permitted licensees', permitted sub-licensees' and permitted co-locators', access to or actions taken in the Lake Parime Co-Location Space, the Facility or the Licensed Space.

3.6 **Services.** Subject to the terms and conditions of this Agreement, Lake Parime shall provide the Utility Services to Client at the Licensed Space and such additional services that may be requested by Client and accepted and agreed to in writing by Lake Parime from time to time ("**Services**"). Subject to Section 3.8, the Utility Services will be available and fully functional no less than 97% of the time.

3.7 **Client's and Lake Parime's Rights.** Except as expressly set forth in this Agreement, (a) Lake Parime has no obligation to expand or otherwise make any improvements within the Property, (b) Lake Parime reserves the right to modify the Common Areas, provided that such modifications do not materially adversely affect Client's use of the Licensed Space for the Permitted Uses, materially adversely affect Client's access to or from the Licensed Space, and (c) Lake Parime makes no representations or warranties regarding the Licensed Space or its suitability (physical, legal or otherwise) for the Permitted Uses or any other particular purpose.

3.8 **Available Power Capacity.** Client shall have exclusive access to ten (10) Megawatts of electrical power, subject to curtailment as agreed (not to exceed 3%). Lake Parime covenants that at least five (5) Megawatts of electrical power will be available at the Licensed Space by July 31, 2022 in a form usable for the HPC Operations and the remaining five (5) Megawatts of electrical power will be available at the Licensed Space by August 15, 2022 in a form usable for the HPC Operations.

3.9 **Purpose.** Subject to Client's compliance with all Laws, Client may use the Licensed Space for the Permitted Use and Client shall not use or permit the Licensed Space to be used for any other purpose or purposes whatsoever. Lake Parime will not take any action that will cause the Permitted Uses or other rights under this Agreement to be prohibited or otherwise materially restricted (and the Parties hereby acknowledge that undue interference with Client's access or security needs is material) by any covenant, condition, restriction, easement or other instrument or matter affecting title or use of the Property. The Agreement will be subject and subordinate to any covenant, condition, restriction, easement or other instrument now existing or hereafter created that meets the requirements of the preceding sentence. At Lake Parime's request, Client shall execute

at Lake Parime's expense, such instruments as may be necessary for the subordination of the Agreement to such covenant, condition, restriction, easement or other instrument.

**4 COMMENCEMENT, CONDITIONS PRECEDENT AND TERM**

4.1 This Agreement shall begin on the Effective Date and shall continue, unless terminated earlier in respect of any HPC Facilities for the Initial Period and shall automatically extend for a Renewal Period at the end of the Initial Period and at the end of each Renewal Period.

4.2 A Party may, not later than three (3) months before the end of the Initial Period or the relevant Renewal Period, give written notice to the other Parties to terminate this Agreement in full at the end of the period then in force.

4.3 Lake Parime reserves the right to change the Hosting Fee upon renewal. Lake Parime will notify Client of the proposed new Hosting Fee no later than four (4) months before the end of the Initial Period or relevant Renewal Period.

4.4 On termination all amounts owing to a Party will be settled by the other Party, including the return of the Security Deposit, if applicable.

**5 HOSTING FEE AND SECURITY DEPOSIT**

5.1 Hosting Fee. In consideration for fulfilling its obligations under this Agreement, Client shall pay Lake Parime a "**Hosting Fee**" which shall be an amount equal to 8 cents ($0.08) US per Kilowatt hour ("**kWh**") of the energy utilized by the HPC Facilities using the available power capacity set out in Section 3.8 (the "**Utilized Energy**"). The Utilized Energy will be calculated on the basis of actual Kilowatt hours and Kilowatts ("**kW**") used each month as measured by the meters to the HPC Facilities.

The Hosting Fee payable each month should be at a minimum the fee due for the use of 90% (Ninety Percent) of energy available under the available power capacity set out in Section 3.8, provided such power was available at least 97% of the time during the period.

5.2 **Security Deposit.** Within two (2) Business Days after the Effective Date, Client shall provide Lake Parime with a security deposit of USD $1,686,528 (the "**Security Deposit**"). The Security Deposit shall be applied by Lake Parime to cover the last three (3) month's Hosting Fees that become payable by Client.

5.3 **Payment Procedures.** Lake Parime shall invoice Client within two (2) Business Days of the end of each calendar month. Client shall pay Lake Parime, within seven (7) days of invoicing, the Hosting Fee. Payment methods include payment via ACH electronic payment to Lake Parime's financial institution per instructions in Client's ACH electronic payment form.

5.4 **Interest.** Upon the occurrence of any Client Default resulting from past due amounts to Lake Parime, the past due amount will thereafter bear interest until paid at a rate equal to the Interest Rate.

## 6 ADDITIONAL CLIENT OBLIGATIONS

6.1 **Compliance with Laws.** Except for Lake Parime's obligations expressly set forth herein, Client shall, at its sole cost and expense, comply with all Laws to the extent such Laws pertain to the unique manner in which Client uses the Licensed Space, as opposed to generic use of the Licensed Space for the Permitted Use and Client shall not do anything or suffer anything to be done in or about the Licensed Space which will in any way conflict with any Law.

6.2 **Covenant Against Liens.** Client has no authority or power to cause or permit any lien or encumbrance of any kind whatsoever, whether created by act of Client, operation of law or otherwise, to attach to or be placed upon the Licensed Space and/or the Facility, and any and all liens and encumbrances created by Client shall attach to Client's interest only. Lake Parime shall have the right at all times to post and keep posted on the Licensed Space any notice which it deems necessary for protection from such liens. Client shall not cause or permit any lien of mechanics or materialmen or others to be placed against the Licensed Space and/or the Facility with respect to work or Services claimed to have been performed for or materials claimed to have been furnished to Client or the Licensed Space, provided, however, in case of any such lien attaching or notice of any lien, Client shall cause it to be immediately released and removed of record (by payment, statutory bond or other lawful means). If any such lien is not released and removed (by payment, statutory bond or other lawful means) within ten (10) days after written notice of such lien is delivered to Client, then Lake Parime may, at its option, take all reasonable actions necessary to release and remove such lien, without any duty to investigate the validity thereof, and all sums, costs and expenses, including reasonable attorneys' fees and costs, incurred by Lake Parime in connection with such lien shall be immediately be due and payable by Client.

6.3 **Non-Interference.** Client warrants that Client's use of the Lake Parime's Co-Location Space shall not interfere with any of the equipment not owned by Client or that of any other Clients on or in the Lake Parime Co-Location Space. In the event there is interference that is attributed to Client, Client shall promptly take reasonable remedial measures to cure any failures with that portion of its HPC Facilities causing the interference, except for intermittent testing, until the interference is corrected.

6.4 **Facility Damage.** Client shall take all commercially reasonable precautions to prevent any damage to the Lake Parime Co-Location Space or the Facility. Upon completion of any maintenance, repair, replacement or removal, or other work in the Lake Parime Co-

Location Space or the Facility by Client, its agents and employees (which shall not include Services done by or on behalf of Lake Parime for Client), Client shall make reasonable efforts to, at its expense, restore the Lake Parime Co-Location Space to its original condition and remove all refuse and debris that may accumulate thereon. In the event Client fails to repair damage to the Lake Parime Co-Location Space or the Facility within thirty (30) calendar days from the date of such completion or the written notification of such damage by Lake Parime, whichever is later, Client shall fully reimburse Lake Parime for any unrepaired property damages resulting from any construction, maintenance, repair, replacement or removal, or other work on the Lake Parime Co-Location Space by Lake Parime, but only to the extent not covered by insurance proceeds from a claim by Lake Parime against its insurance policy.

6.5 **Client Software and Third-Party Services**. In order to provide the Services under the Agreement, from time to time, Lake Parime may request, and Client shall promptly provide, information regarding the HPC Facilities, Client's related operating software, Client's system and other information reasonably necessary in the provision of the Services. If software or services of a third party are requested by Client in conjunction with the Services ("**Third Party Services**"), Client acknowledges and agrees that such Third Party Services are the responsibility of the third party, subject to separate terms and conditions between such third party and Client, and Lake Parime accepts no responsibility for the performance of such Third Party Services or any loss or damage arising from or associated with the provision of such Third Party Services. If the HPC Facilities or related operating software are not suitable for the provisions of any services provided by Lake Parime related to the HPC Facilities, Lake Parime may suspend such services until remedial action has been taken by Client and Lake Parime has verified the HPC Facilities and operating software are suitable for the provision of the relevant services.

6.6 **Client Visits to the Facility.** Client shall not visit the Licensed Space or Facility without prior consent from Lake Parime, such consent not to be unreasonably withheld.

## 7 ALTERATIONS, ADDITIONS AND IMPROVEMENTS

7.1 **Alterations.** Client may not make alterations, improvements or changes to the Licensed Space ("**Alterations**") without the express written approval of Lake Parime, such consent not to be unreasonably withheld, delayed or conditioned. Installation and removal of HPC Facilities or property, including networking lines and connections between Client's Equipment and electrical outlets, will not be considered Alterations. If Lake Parime provides its approval for an Alteration but informs Client that a proposed Alteration will adversely affect the provision of Services under this Agreement, Client will work with Lake Parime to modify the Alteration to avoid any such impact. In the event Lake Parime's

Services are impacted by any such Client Alteration, however, Lake Parime shall be relieved of any resulting liability and any obligation to provide such Services.

7.2 **Alterations Process.** Client shall not make or permit to be made any Alterations except in strict accordance with the provisions of this Section 7. Client will (i) submit all plans, specifications, finishes and construction drawings for any Alterations to Lake Parime for Lake Parime's review and approval, and (ii) construct all Alterations and perform all repairs in compliance with any and all Laws, including without limitation applicable rules and regulations of any federal, state, county or municipal code or ordinance and, to the extent applicable for such work, pursuant to a valid building permit, issued by the city in which the Facility is located. Lake Parime's approval of the plans, specifications, finishes and construction drawings for Client's Alterations shall create no responsibility or liability on the part of Lake Parime for their completeness, design sufficiency, or compliance with all Laws. All work with respect to any Alterations must be done in a good and workmanlike manner and diligently prosecuted to completion to the end that the Licensed Space shall at all times be a complete unit except during the period of work. Client shall cause all Alterations to be performed in such manner as not to obstruct access by any person to the Facility, and as not to obstruct the business of Lake Parime or other clients of the Facility or interfere with any labour force working at the Facility. Promptly upon completion of any Alterations, Client shall (A) cause a Notice of Completion to be recorded in the office of the Recorder of the county in which the Facility is located, (B) deliver to the management office for the Facility a reproducible copy of the "as built" drawings of the Alterations, and (C) deliver to Lake Parime evidence of payment, contractors' affidavits and full and final waivers of all liens for labor, services or materials.

7.3 **Removal of Alterations.** Lake Parime shall notify Client whether it is obligated to remove any Alteration. In the event Client is obligated to remove the Alteration, Client shall remove such Alteration(s) installed or placed in the Licensed Space by or for Client and repair any material damage to the Licensed Space or Facility caused by its removal activity. If Client fails to complete such removal within a reasonable period of time, restoration and/or to repair by the end of the Term, Lake Parime may do so and may charge the cost thereof to Client.

## 8 ASSIGNMENT AND OTHER DEALINGS

No Party shall assign, transfer, mortgage, charge, subcontract, delegate, declare a trust over or deal in any other manner with any or all of its rights and obligations under this Agreement other than with an Affiliate without the prior written consent of the other Parties (not to be unreasonably withheld, delayed or conditioned).

## 9 LIABILITY

9.1 Lake Parime shall have no liability to Client in contract, tort (including negligence and breach of statutory duty), under statute or otherwise for any: (a) loss of business opportunity; (b) loss of anticipated savings; (c) loss of profit (whether actual or anticipated); (d) loss of or damage to data, equipment or property (excluding where this results from Lake Parime performing or failing to perform its obligations under this Agreement); (e) economic loss; (f) loss of interest or revenue; (g) damage to goodwill; (h) loss or damage suffered by third parties; or (i) indirect, consequential or special loss or damage of any nature.

9.2 Notwithstanding any other provisions of this Agreement, nothing in this Agreement shall exclude or limit a Party's liability to another Party for:

(a) death or personal injury resulting from negligence;

(b) fraud or fraudulent misrepresentation; or

(c) any liability where such exclusion or limitation is not permitted by law.

Subject to the foregoing sub-clauses of this clause 9, Lake Parime’s total aggregate liability to Client under or in connection this Agreement (whether in contract, tort (including negligence), breach of statutory duty or otherwise) shall not exceed 100% of the aggregate amounts invoiced, paid or payable to Lake Parime under clause 5 of this Agreement during the Term.

## 10 INDEMNIFICATION

10.1 **Client.** Except to the extent liability is waived in this Agreement, and subject to the limits set forth herein, Client will indemnify, defend, and hold harmless Lake Parime, Lake Parime’s Affiliates, and their members, sub members, managers, shareholders, partners and sub partners, and their respective officers, directors, agents, property managers, servants, employees, and independent contractors (collectively, “**Lake Parime Parties**”) from third party claims, suits, actions, liabilities losses, costs, damages, penalties, fees, and expenses (including reasonable attorneys’ fees and costs) for personal injury, death or for loss or damage to property (“**Claims**”) incurred in connection with or that arise out of: (i) any intentional acts or gross negligence of Client or of any person claiming by, through or under Client, or of its employees, agents, contractors or invitees, in, on or about the Licensed Space or the Property; (ii) other claims by third parties, including claims for death, personal injury, or damage to property, to the extent caused directly or indirectly by Client or of any of Client’s employees, agents, contractors or invitees; or (iii) Client having made inaccurate or unauthorized warranties, representations or statements, or otherwise acting beyond the scope of its authority as set out in this Agreement.

10.2 **Lake Parime.** Subject to the limits set forth herein, Lake Parime will indemnify, defend, and hold harmless Client, Client's Affiliates, and their members, sub members, managers, shareholders, partners and sub partners, and their respective officers, directors, agents, property managers, servants, employees, and independent contractors from Claims incurred in connection with or that arise out of: (i) Lake Parime's breach of its obligations under this Agreement, or under any agreement that Lake Parime may have with the owner or licensor of the Location, Property or Facility; (ii) any negligent acts or omissions of Lake Parime or of any of Lake Parime's employees, agents, contractors or invitees, in, on or about the Licensed Space or the Property; (iii) other claims by third parties, including claims for death, personal injury, or damage to property, to the extent caused directly or indirectly by Lake Parime or of any of Lake Parime's employees, agents, contractors or invitees; or (iv) Lake Parime having made inaccurate or unauthorized warranties, representations or statements, or otherwise acting beyond the scope of its authority as set out in this Agreement.

**11 INSURANCE**

11.1 Unless otherwise agreed between the Parties, each Party shall be responsible for and shall take out adequate third-party insurance to cover its obligations hereunder.

11.2 If Lake Parime sub-contracts the performance of its obligations under this Agreement, Lake Parime shall ensure that the relevant sub-contractor has adequate insurance cover in place having regard to the obligations it will be performing.

**12 CONFIDENTIALITY**

12.1 All Confidential Information disclosed by a Party (the "**Disclosing Party**") to another Party (the "**Receiving Party**") at any time before or after the date hereof in connection with this Agreement shall be treated as confidential and safeguarded hereunder by the Receiving Party and the Receiving Party shall use it exclusively in connection with this Agreement and shall not publish or disclose the same, except to its Affiliates and its and their respective employees, officers, financiers, professional advisers, contractors and subcontractors (provided always that the Receiving Party shall ensure that its Affiliates and its and their respective employees, officers, financiers, professional advisers, contractors and subcontractors to whom any Confidential Information is disclosed comply with this clause 12) without the prior written agreement of the Party owning such Confidential Information.

12.2 The Receiving Party agrees that financial damages would not be a sufficient remedy for any breach of clause 12.1 of this Agreement and that the Disclosing Party shall be entitled to seek injunctive or other equitable relief to remedy or prevent any breach or threatened breach of clause 12.1 of this Agreement by the Receiving Party or any of its employees. Such remedy shall not be the exclusive remedy for any breach of clause 12.1 of this

Agreement, but shall be in addition to all other rights and remedies available at law or in equity.

12.3 The obligation of confidentiality shall not apply to any Confidential Information to the extent that such information:

(a) is in the public domain at the time of receipt or subsequently becomes part of the public domain by publication or otherwise other than by the default of the Receiving Party or its representatives;

(b) is already known to the Receiving Party without restriction prior to receipt from the Disclosing Party, as evidenced by prior existing records of the Receiving Party;

(c) is received from a third party otherwise than in breach of any contractual, legal, fiduciary or other obligation of confidentiality with respect to such information;

(d) is independently developed by the Receiving Party without use of or reference to the Confidential Information.

The Receiving Party will be allowed to disclose the Confidential Information to the extent that such disclosure is required by law or any governmental or other relevant regulatory authority; provided that wherever practical the Receiving Party shall provide the Disclosing Party with timely notice of such required disclosure and shall cooperate with the Disclosing Party, at the Disclosing Party's reasonable request and expense, in any lawful action to contest or limit the scope of such required disclosure.

12.4 For the avoidance of doubt this clause 12 (*Confidentiality*) shall survive the termination and/or expiry of this Agreement for a period of five years.

**13 CLIENT PROPERTY**

13.1 **Removal of Client Property.** Lake Parime agrees that property owned by Client and forming part of Client's HPC Facilities ("**Client Property**") will remain such and be treated as moveable trade fixtures for the purpose of this Agreement. Client, at its own cost and expense, may install, place, reinstall or replace Client Property upon the Licensed Space or any other portion of the Property, or remove any Client Property subject to conditions stipulated in Clause 8. Upon the expiration of the Term, Client may, at its sole discretion and cost, elect to remove or not any cabinets, racks, cabling, and cable trays, but will remove all other Client Property and Alterations from the Licensed Space and other portions of the Property. Client will repair any material damage to the Licensed Space, the building, and the Property caused by Client's removal of Client property.

13.2 **No Lien**. In no event (including a default under this Agreement) will Lake Parime have any lien or other security interest in any Client property, and Lake Parime hereby

expressly waives and releases any lien or other security interest therein however created or arising.

13.3 **Surrender.** No act or thing done by Lake Parime or any agent or employee of Lake Parime during the Term shall be deemed to constitute an acceptance by Lake Parime of a surrender of the Licensed Space unless such intent is specifically acknowledged in a writing signed by an authorized signatory for Lake Parime.

**14 DEFAULT**

14.1 The following events shall be "**Events of Default**":

Failure by Client or Lake Parime, as applicable, to pay any undisputed amount due hereunder when due;

Failure of Lake Parime to meet the service levels set out in Section 3.6 on more than three (3) occasions in three (3) consecutive months.

Failure of Client or Lake Parime, as applicable, to perform any other material obligation hereunder and such failure continues uncured for thirty (30) Days after receipt by the defaulting Party of written notice of such failure; provided, that so long as a defaulting Party has initiated and is diligently attempting to effect a cure (provided such obligation is curable), the defaulting Party's cure period shall extend for an additional thirty (30) days;

Any representation or warranty made by Lake Parime or the Client, as applicable, under this Agreement shall have been false or inaccurate in any material respect when made or becomes false or inaccurate in any material respect, and such falsity or inaccuracy continues uncured for thirty (30) Days after receipt by the defaulting Party of written notice of such falsity or inaccuracy; provided that so long as a defaulting Party has initiated and is diligently attempting to effect a cure (provided such representation or warranty is curable), the defaulting Party's cure period shall extend for an additional thirty (30) days.

14.2 In the event of a Client Default, Lake Parime has the right to use the Security Deposit to cover the financial impact of Client Default.

14.3 In the case of an Event of Default, the non-defaulting Party may terminate this Agreement without prejudice to any claim to damages.

**15 FORCE MAJEURE**

No Party shall be in breach of this Agreement nor liable for delay in performing, or failure to perform, any of its obligations under this Agreement if such delay or failure results from a Force Majeure Event. In such circumstances the time for performance shall be extended by a period that is agreed by the Parties.

**16 GOVERNING LAW AND DISPUTE RESOLUTION**

16.1 The laws of the State of Washington, without reference to conflict of law rules, govern this Agreement and any dispute of any sort that might arise between the parties. Any dispute relating in any way to the Products or this Agreement will only be adjudicated in a state or federal court located in King County, Washington. Each party consents to exclusive jurisdiction and venue in these courts. Notwithstanding the foregoing, any party may seek injunctive relief in any state, federal, or national court of competent jurisdiction for any actual or alleged breach of confidentiality or infringement of such Party's Intellectual Property or other proprietary rights. The United Nations Convention for the International Sale of Goods does not apply to this Agreement.

16.2 Without prejudice to any other remedies available to the Parties, in the event that a Party disputes a matter arising in connection with this Agreement:

(a) that Party shall notify the other Parties as soon as reasonably practicable with details of the dispute and all of the Parties shall meet within fourteen (14) days of receipt of such notice (in good faith) in order to try and resolve the dispute; and

(b) if the dispute is not resolved at that meeting, any Party may refer the dispute to the courts for resolution in accordance with clause 16.1.

**17 NOTICES**

17.1 Any notice given under this Agreement shall be in writing and shall be delivered by hand or sent by pre-paid first class post, airmail or email to the receiving Party at the following address and email address (or to such other address or email address as that Party may from time to time notify to the other Parties):

Lake Parime:

Contact: SATHESAN GANESARAJAH

Address: 522 W RIVERSIDE AVE, STE 4212, SPOKANE, WA, 99201-0580, UNITED STATES

Email: operations@lakeparime.com

12273977 Canada Inc.:

Contact: LARS JORGENSEN

Address: 181 Bay Street, Unit 4260 Toronto, Ontario M5J 2V1, Canada

Email: info_operations@taal.com

17.2 Any notice or communication given under this Agreement shall be deemed to have been received:

(a) if delivered by hand, on that day;

(b) if sent by pre-paid first-class post, at 9.00 am GMT on the third day after the day of posting;

(c) if sent by email on a Business Day, on that day, or in any other case, on the next following Business Day (in each case unless the sender receives an undeliverable message).

**18 GENERAL**

18.1 This Agreement, together with the Maintenance and Management Agreement between the Parties of even date herewith, constitutes the entire agreement between the Parties and supersedes and extinguishes all previous agreements, arrangements, promises, assurances, warranties, representations and understandings between the Parties (whether written or oral) relating to its subject matter. The Parties acknowledge that they have not entered into this Agreement in reliance upon, and shall have no remedies in respect of, any representation, assurance, statement, covenant, warranty, agreement or undertaking of any nature whatsoever made or given by or on behalf of another Party that is not set out in this Agreement.

18.2 Each Party represents and warrants that it has full authority to execute and perform this Agreement.

18.3 Except where this Agreement provides otherwise, each Party shall pay its own costs relating to or in connection with the negotiation, preparation, execution and performance by it of this Agreement.

18.4 No variation of this Agreement or any agreement or document entered into pursuant to this Agreement shall be valid unless it is in writing (which, for the purposes of this clause 18.4, excludes email) and signed by or on behalf of each of the Parties.

18.5 No delay, indulgence or omission in exercising any right, power or remedy provided by this Agreement or by law shall operate to impair or be construed as a waiver of such right, power or remedy or of any other right, power or remedy.

18.6 This Agreement shall be binding upon and endure for the benefit of the successors in title and permitted assignees of the Parties.

18.7 Nothing herein contained shall be deemed to constitute any Party a partner, agent or representative of another Party and accordingly each Party hereby agrees and

undertakes that it shall not, without the prior written consent of the relevant other Party, at any time or from time to time:

(a) incur or purport to incur by itself, its employees, agents, contractors, sub-contractors and the employees of any of them, any liability or obligation whatsoever in the name or on behalf of that Party or in any manner of way to hold itself or themselves or himself or herself out as agent for that Party or otherwise to represent itself or themselves or himself or herself as having ostensible authority to act on that Party's behalf; or

(b) take or purport to make that Party bound as guarantor or surety in any manner of way whatsoever.

18.8 If any provision of this Agreement is or becomes illegal, invalid or unenforceable under the law of any jurisdiction, this Agreement shall be considered divisible as to that provision and such provision is to that extent to be deleted from this Agreement and substituted by a provision which, as far as the Applicable Law allows, comes nearest to what the Parties desire according to the natural meaning of the terms of this Agreement.

18.9 This Agreement may be executed in any number of counterparts and by the different Parties on separate counterparts, but shall not take effect until each Party has executed at least one counterpart. Each counterpart shall constitute an original but all the counterparts together shall constitute a single agreement.

**IN WITNESS WHEREOF** the Parties have executed this Agreement on the day set out at the top of this Agreement.

Signed by SATHESAN GANESARAJAH for and on behalf of **LAKE PARIME USA INC.**

....................

Chief Executive Officer

Signed by ANGELA HOLOWAYCHUK for and on behalf of **12273977 CANADA INC.**

....................

Director

**Schedule 1**

**SITE DIAGRAM**

Site overview with fence line:




Site plan:




LTR
DATE
DESCRIPTION
REV. BY:
12.5
4.3
19X POWER CABLES
POWERDOCK
2.4
POWERBOX
POWERBOX
6.5
LV
TX
MV
STAIRS
CONCRETE SLAB
2.2
POWERDOCK
PRELIMINARY DRAFT
Lake Parime
1 POULTRY
LONDON, UNITED KINGDOM, EC2R 8EJ
Tel: +44 (0)207 903 6879
lakeparime.com
DO NOT SCALE DRAWING
2 – DETAILED PLAN VIEW
COSHOCTON OHIO
COSHOCTON OHIO
B
JT
20-May-22
LP_PP_COSHOCTONOHIO_001
CHECKER
DD-MMM-YY
N/A
APPROVER
DD-MMM-YY
2 OF 3


LTR
DATE
DESCRIPTION
REV. BY:
POWERDOCK
POWERBOX
POWERBOX
EXISTING CONCRETE PAD
SMALL TOP BLOCKS
CONCRETE SLAB
PRELIMINARY DRAFT
Lake Parime
1 POULTRY
LONDON, UNITED KINGDOM, EC2R 8EJ
Tel: +44 (0)207 903 6879
lakeparime.com
DO NOT SCALE DRAWING
3 – ELEVATION
COSHOCTON OHIO
COSHOCTON OHIO
B
JT
20-May-22
LP_PP_COSHOCTONOHIO_001
CHECKER
DD-MMM-YY
N/A
APPROVER
DD-MMM-YY
3 OF 3

## Schedule 2

### HPC FACILITIES

| Equipment Type | Number | Expected Arrival |
|---|---|---|
| Antminer S19j Pro 96 TH/s | 130 | Latest 01-Aug-2022 |
| Antminer S19j Pro 100 TH/s | 193 | Latest 01-Aug-2022 |
| Antminer S19j Pro 104 TH/s | 655 | Latest 01-Aug-2022 |
| Sub-Total | 978 | |
| Antminer S19j Pro 92 TH/s | 60 | Latest 15-Aug-2022 |
| Antminer S19j Pro 96 TH/s | 120 | Latest 15-Aug-2022 |
| Antminer S19j Pro 100 TH/s | 216 | Latest 15-Aug-2022 |
| Antminer S19j Pro 104 TH/s | 590 | Latest 15-Aug-2022 |
| Sub-Total | 986 | |
| Antminer S19j Pro 92 TH/s | 120 | Latest 15-Aug-2022 |
| Antminer S19j Pro 96 TH/s | 200 | Latest 15-Aug-2022 |
| Antminer S19j Pro 100 TH/s | 188 | Latest 15-Aug-2022 |
| Antminer S19j Pro 104 TH/s | 490 | Latest 15-Aug-2022 |
| Sub-Total | 998 | |
| **TOTAL** | **2,962** | |

Numbers and performance of models can vary slightly.

# TAAL - Co-location Agreement - 16 June 2022

Final Audit Report 2022-06-16

| | |
|---|---|
| Created: | 2022-06-16 |
| By: | Operations Lake Parime (operations@lakeparime.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAfLvk5ZZkZvYI7MP98P6He2SCMFSamt97 |

## "TAAL - Co-location Agreement - 16 June 2022" History

- Document created by Operations Lake Parime (operations@lakeparime.com)
  2022-06-16 - 9:03:37 PM GMT- IP address: 2.223.242.112

- Document emailed to Angela Holowaychuk (angela@taal.com) for signature
  2022-06-16 - 9:04:09 PM GMT

- Email viewed by Angela Holowaychuk (angela@taal.com)
  2022-06-16 - 9:04:49 PM GMT- IP address: 104.28.124.16

- Document e-signed by Angela Holowaychuk (angela@taal.com)
  Signature Date: 2022-06-16 - 9:21:46 PM GMT - Time Source: server- IP address: 72.143.223.34

- Agreement completed.
  2022-06-16 - 9:21:46 PM GMT