The Honorable Tana Lin

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| 12273977 CANADA INC.,<br><br>Plaintiff,<br><br>v.<br>CS GLOBAL ENERGY US INC., f/k/a LAKE PARIME USA INC.,<br><br>Defendant. | CASE NO. 2:25-cv-01630-TL<br><br>**DECLARATION OF LARS JORGENSEN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

I, Lars Jorgensen, declare as follows:

1. I am over eighteen years old and if called to testify am competent to do so as follows based on personal knowledge.

2. At all relevant times set forth in the Complaint, I served as the director of 12273977 Canada Inc., the plaintiff in the above-captioned case ("Plaintiff"), and Chief Operating Officer of Teranode Group AG, the parent company of Plaintiff.

3. I submit this Declaration in support of Plaintiff's Motion for Summary Judgment. Unless otherwise stated, the facts contained in this Declaration are based on my personal knowledge or my review of Plaintiff's records kept in the ordinary course of business. Plaintiff creates, receives, and maintains records, including the documents attached as exhibits to the



MCDERMOTT WILL & SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

Complaint and this Declaration, in the regular course of its business activities. All the documents were received, created, or otherwise generated at or near the dates reflected on such documents.

4. I have been active in the cryptocurrency industry since late 2018 in various capacities. Based on those experiences and positions, I am familiar with the function and operation of the blockchain technology on which cryptocurrency is based.

5. For cryptocurrencies such as bitcoin, and its variants, that operate on a proof-of-work consensus mechanism, transactions are verified through high-powered computers, commonly referred to as mining "rigs," that use computational power to solve complex cryptographic puzzles. Solving those puzzles validates cryptocurrency transactions, which are recorded in the blockchain and generate new crypto as a reward to the mining rig's owners – a process known as "mining" crypto.

6. To mine cryptocurrencies, rigs need an internet connection and electricity. Thus, the amount of available power, internet speed, and the cost of these services are key considerations. To mine crypto profitably at scale, rig owners may pay to host or "co-locate" fleets of their rigs in data centers that have access to fast internet and cheap electricity.

7. Another important consideration in a co-location arrangement is the rig owner's entitlement to "uptime," *i.e.*, the percentage of time that the mining rigs are connected and operational. For example, a fleet of mining rigs that loses power for six hours will have 75% uptime that day (all else being equal).

8. Plaintiff is a Canadian blockchain company that owns and manages scalable blockchain infrastructure, including mining rigs.

9. I understand that Defendant CS Global Energy US Inc., f/k/a Lake Parime USA Inc., is a Washington corporation that operates a data center in Coshocton, Ohio (the "Facility").



MCDERMOTT WILL & SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

The Facility offers space, power, internet, and labor, where owners of cryptocurrency rigs can store their rigs to mine cryptocurrencies.

10. On or around June 16, 2022, Plaintiff signed a Co-location Agreement with Defendant, then called Lake Parime USA Inc., to host Plaintiff's mining rigs in the Facility. A true and complete copy of the Co-location Agreement, dated June 16, 2022, is attached hereto as **Exhibit A**.

11. The Co-location Agreement required Defendant to host Plaintiff's mining rigs and supply them with electricity and internet access. Exhibit A § 2.2. For its part, Plaintiff agreed to pay a security deposit, pay for electricity, Exhibit A § 5, and receive crypto from the rigs.

12. The Co-location Agreement required Plaintiff to pay a security deposit of $1,686,528. Plaintiff paid that amount via wire transfer on June 17, 2022. Attached hereto as **Exhibit B** is a true and complete copy of Plaintiff's bank statement for June 2022, which reflects an outgoing wire from Plaintiff to Lake Parime USA Inc. (Defendant's former name) in the amount of $1,686,528 on June 17, 2022.

13. The parties entered an amendment to the Co-location Agreement on June 24, 2022. In Plaintiff's motion papers and in my Declaration, we refer to the Co-location Agreement and the Amendment together as the "Co-location Agreement." The chief modification in the amendment was to reduce the security deposit to $1,633,824 and change the electricity price to $0.0775 per kilowatt-hour (kWh). A true and complete copy of the Amendment to the Co-location Agreement, dated June 24, 2022, is attached hereto as **Exhibit C**.

14. Defendant refunded the $52,704 between the original and amended security deposit amounts by wire transfer to Plaintiff on July 15, 2022. Below is a true and complete copy of a screenshot of the wire confirmation emailed to me by Defendant's personnel:

| | |
|---|---|
| * **Required Information** | |
| **From Account:** | [redacted] LAKE PARIME INTERNAT |
| **To Account:** | [redacted] 12273977 CANADA INC |
| **Bank:** | Signature Bank 565 Fifth Avenue<br>10017 New York NY United States of America (the) |
| **Beneficiary:** | 12273977 CANADA INC Suite 4260, 181 Bay St<br>Toronto ON M5J 2T3 CA |
| **Payment Method:** | Credit Account no advice |
| **Value Date:** | Jul 15, 2022 |
| **Payment Amount:** | 52,704.00 USD |
| **Comments:** | |
| **Payment Details:** | LPIR Refund Sale Invoice SI-140-12279377 CAN |

15. Plaintiff purchased industrial-grade power cables through Defendant that were delivered to the Facility where they connected Plaintiff's rigs to the Facility's power supply; the power cables cost Plaintiff $43,214.40, with $20,063.95 for delivery, for a total purchase price of $63,278.35. Attached hereto as **Exhibit D** is a true and complete copy of Invoice SI-140 in June 2022 to Plaintiff evidencing Plaintiff's purchase of the power cables. Exhibit B further evidences Plaintiff's payment of Invoice SI-140 on June 29, 2022.

16. Plaintiff installed its mining rigs in the Facility in or around October 2022, connected them with the power cables it had purchased, and the rigs began mining.

17. Under Section 3.8 of the Co-location Agreement, Plaintiff had "exclusive access to ten (10) Megawatts of electrical power" but was responsible for paying the higher of 90% of that 10 Megawatts (*i.e.*, 9 MW) or actual power usage, provided the rigs operated at 97% uptime. If the rigs operated at less than 97% uptime, Plaintiff would be charged based on actual power usage.

18. The Co-location Agreement was for an initial five-year term. Exhibit A §§ 1.1, 4.1-4.3. The parties' payment obligations survive termination of the agreement, which states that,



MCDERMOTT WILL & SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

in the event of a termination, "all amounts owing to a Party will be settled by the other Party, including the return of the Security Deposit, if applicable." Exhibit A § 4.4.

19. Plaintiff performed all its obligations under the Co-location Agreement.

20. I understand that Defendant had a change of ownership in or around 2023, but at no point did I have an understanding that the identity of the party with whom we contracted had changed, or that its obligations under the agreement had changed.

21. In or around mid-2025, Defendant informed me that Defendant wanted to terminate the Co-location Agreement early so that Defendant could repurpose the Facility as an artificial intelligence data center. On behalf of Plaintiff, I agreed.

22. On May 2, 2025, the parties signed a Termination Agreement (together with the Co-location Agreement, the "Agreements"). I signed the Termination Agreement on behalf of Plaintiff and Defendant's CEO, Jesper Øhlenschlager, executed the Termination Agreement on behalf of "CS Global Energy US Inc. (Formerly Lake Parime USA, Inc.)". A true and complete copy of the Termination Agreement is attached hereto as **Exhibit E**.

23. The Termination Agreement states that, by May 1, 2025, Plaintiff "will settle invoice number SI-229 for US$455,886." As of the date of the Termination Agreement, Plaintiff had already settled that invoice by paying it in full on April 30, 2025.

24. Under the Termination Agreement, Plaintiff also agreed by June 1, 2025 to "commence . . . the de-racking, packaging[,] and removal of all its Mining Equipment, and any other equipment owned by Client [*i.e.*, Plaintiff] . . . from the Installed Location," and to make an agreed payment of $105,000 to cover certain removal costs. Exhibit E §§ 2(b), (e).

25. The Termination Agreement also requires Defendant to return Plaintiff's security deposit, stating: "By June 1, 2025 CSGE US [*i.e.*, Defendant] shall return the Security Deposit to



MCDERMOTT WILL & SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

the Client, being US$1,633,824." Exhibit E § 2(c). It further provides for a $500,000 credit to Plaintiff as follows:

> In addition to the return of the Security Deposit, [Plaintiff] will be provided a credit of US$500,000 (the "Credit"). The Credit will be offset against any Hosting Fee or Additional Services Fees amounts owing by [Plaintiff] under the [Co-location Agreement] and Management Agreement to the date all of the Mining Equipment is removed from the Installed Location, after true-up of any applicable credits. Any remaining balance of the Credit will be paid to [Plaintiff] as set forth in Section 2(b) of this termination agreement within ten (10) days thereafter.

Exhibit E § 2(d).

26. There are no "Hosting Fee or Additional Service Fees amounts owing by" Plaintiff. The only amounts due and owing are a reconciliation for May 2025 and a refund of prepayment for June 2025, both of which Defendant owes Plaintiff.

27. Plaintiff tendered payment to Defendant of the $105,000 exit fee by demanding that Defendant net this amount out of the monies owed to Plaintiff.

28. Thus, under the plain text of the Termination Agreement, there would be no offset to the $500,000 credit (other than netting out Plaintiff's agreed exist payment of $105,000).

29. On June 2, 2025, having not received the repayment of its Security Deposit, Plaintiff reminded Defendant of its obligation under the Termination Agreement, and requested Defendant's payment of the Security Deposit. Defendant responded by demanding as a condition of payment that Plaintiff submit certain documentation and authorizations not required by the parties' agreements and that Defendant had never before required when invoicing Plaintiff. A true and complete copy of the email correspondence between Plaintiff and Defendant between June 2 and June 20, 2025, is attached hereto as **Exhibit F**.

30. Plaintiff nonetheless provided the requested documentation. *See* Exhibit F.



MCDERMOTT WILL & SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

31. After the Termination Agreement was signed, Plaintiff removed its mining equipment from the Facility, other than Plaintiff's power cables, which Defendant prevented from being removed.

32. Despite Plaintiff's indisputable ownership of the power cables, Defendant's CEO Øhlenschlager prevented the workers conducting the move-out from packing up Plaintiff's power cables, which Defendant unlawfully withheld, even though Defendant has no basis to possess the cables now that Plaintiff's machines are no longer in the Facility mining crypto for Plaintiff.

33. Plaintiff paid for and rightfully owns its power cables, which it installed and maintained at the Facility under the parties' Co-location Agreement. *See* Exhibits B, D.

34. Section 2(b) of the Termination Agreement expressly entitled, indeed required, Plaintiff to remove its equipment. Yet Defendant refused to let Plaintiff retrieve its cables.

35. By letter dated June 19, 2025, Plaintiff confirmed to Defendant that Plaintiff had fulfilled its obligations under the Termination Agreement and advised that Plaintiff's Security Deposit, the June 2025 Hosting Fee prepayment, and the agreed-upon exit payments (net $395,000) remained due and owing. Plaintiff also demanded that Defendant true up its May 2025 prepayment (that Plaintiff made in March 2025 on invoice SI-222) and return Plaintiff's power cables. A true and complete copy of this letter, dated June 19, 2025, is attached hereto as **Exhibit G**.

36. Defendant never responded to this letter. Plaintiff sent a second letter, dated June 27, 2025, advising that Defendant had breached the Termination Agreement and again demanding return of its money as well as its power cables. A true and complete copy of the letter, dated June 27, 2025, is attached hereto as **Exhibit H**.



MCDERMOTT WILL & SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

37. Nonetheless, Defendant never returned Plaintiff's security deposit. Nor did it ever pay Plaintiff the $395,000 owed under the Termination Agreement (*i.e.*, the $500,000 credit to Plaintiff under the Termination Agreement net of the $105,000 exit payment to Defendant).

38. Defendant is also still withholding Plaintiff's $105,263.53 overpayment for May 2025 hosting services, and its entire $558,000 prepayment for non-existent June 2025 hosting services.

39. Defendant still refuses to return Plaintiff's power cables, initially claiming that the cables actually belonged to Defendant.



MCDERMOTT WILL & SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 14, 2025, at Zug, Switzerland.

Signed by:
67B1D9E45E6440F...

Lars Jorgensen



MCDERMOTT WILL & SCHULTE
444 WEST LAKE STREET, SUITE 4000
CHICAGO, ILLINOIS 60606-0029
TELEPHONE: 312.372.2000