# EXHIBIT B

**Dated** **27 January 2023**

**LAKE PARIME LIMITED (IN ADMINISTRATION)**

**and**

**EDWARD GEORGE BOYLE AND WILLIAM JAMES WRIGHT AS JOINT ADMINISTRATORS OF LAKE PARIME LIMITED (IN ADMINISTRATION)**

**and**

**STATAR MINING LTD**

**and**

**Mr RON OZER**

# BUSINESS AND ASSET SALE AGREEMENT

KEYSTONE LAW

## TABLE OF CONTENTS


1. Interpretation ........ 4
2. Agreement to sell and purchase ........ 15
3. Purchase Price ........ 16
4. Asset Completion ........ 17
5. Passing of risk ........ 18
6. Target Contracts ........ 18
7. Intellectual property ........ 20
8. Third Party Assets ........ 20
9. ROT Assets ........ 21
10. Book Debts ........ 22
11. Employees ........ 23
12. Apportionments and prepayments ........ 24
13. Taxation ........ 24
14. Promotional Literature ........ 26
15. Seller's Records ........ 26
16. Buyer’s Records ........ 27
17. VAT Records ........ 27
18. Data protection ........ 27
19. Business Name ........ 28
20. Correspondence ........ 28
21. Administrators' liability and status of claims ........ 28
22. Exclusions and Buyer warranty ........ 28
23. Time of essence ........ 30
24. Confidentiality and announcements ........ 30
25. Further assurance ........ 31
26. Assignment ........ 31
27. Whole agreement ........ 32
28. Variation ........ 32
29. Costs ........ 32
30. Notice ........ 32
31. Interest on late payment ........ 34
32. Severance ........ 34
33. Contra proferentem ........ 34
34. Agreement survives Asset Completion ........ 34
35. Third party rights ........ 34
36. Successors ........ 35
37. Counterparts ........ 35
38. Language ........ 35
39. Governing law and jurisdiction ........ 35
40. Jurisdiction ........ 35

**Schedule**

Schedule 1 Values of Assets.......... 37
Schedule 2 : Target Contracts.......... 39
Schedule 3 : Target Fixed Assets.......... 40
Schedule 4 The Employees.......... 41
Schedule 5 Office Equipment.......... 42
Schedule 6 : Unsecured Creditor Claims.......... 51

This Agreement is dated 27 January 2023.

**Parties**

(1) LAKE PARIME LIMITED (in administration) incorporated and registered in England and Wales with company number 11773819 whose registered office is at 1 Poultry, London, EC2R 8EJ acting by the Administrators (the **"Seller"**);

(2) EDWARD GEORGE BOYLE and WILLIAM JAMES WRIGHT as joint administrators of Lake Parime Limited both of Interpath Advisory of 10 Fleet Place, London, EC2M 7RB (the **"Administrators"**);

(3) STATAR MINING LTD incorporated and registered in England and Wales with company number 14616624 whose registered office is at 5 New Street Square, London, EC4A 3TW (the **"Buyer"**); and

(4) MR RON OZER, of 1111 Bricknell Avenue, Suite 2650, Miami, Florida 33131 United States of America ("Mr Ozer").

**Background**

(A) The Seller carries on the Business.

(B) The Administrators were appointed joint administrators of the Seller on the Appointment Date by the directors of the Seller under paragraph 22 of Schedule B1 to the Insolvency Act 1986.

(C) The Seller has agreed to sell and the Buyer has agreed to purchase such right, title and interest (if any) as the Seller has in the Business and the Assets on the terms and conditions of this Agreement.

(D) As part of the Consideration, the Buyer has agreed to procure, and Mr Ozer has agreed to provide his agreement to postpone a portion of his Unsecured Creditor Claims, on the terms and conditions of this Agreement.

(E) The Administrators have entered into this Agreement solely for the purpose of obtaining the benefit of the provisions in their favour and shall incur no personal liability of any kind under or in connection with this Agreement.

**Agreed terms**

**1. Interpretation**

1.1 The following definitions and rules of interpretation apply in this Agreement.

| | |
|---|---|
| **"2022 Sale Agreement"** | the sale agreement entered into between Mr Ozer and the Seller on 7 March 2022 in respect of certain IT equipment. |
| "**Administration** | means a liability pursuant to paragraph 99(4) of |

| | |
|---|---|
| **Expense"** | schedule B1, Insolvency Act 1986 and/or Rule 3.50 of the Insolvency (England and Wales) Rules 2016. |
| **"Administrators' Records"** | all records produced by or at the direction of the Administrators, their staff, agents or representatives in connection with the administration of the Seller, the statutory books and accounting records of the Seller, any other records which the Administrators are required by law to retain and any records which relate to the Seller's arrangements with its bankers. |
| **"Administrators' Solicitors"** | Keystone Law. |
| **"Appointment Date"** | means 27 January 2023. |
| **"Asset Completion"** | the completion of the sale and purchase of the Business and the Assets pursuant to and in accordance with clause 4. |
| **"Assets"** | the property, rights and assets set out in clause 2.1.1 to 2.1.15 (inclusive). |
| **"Bank"** | Barclays Bank plc. |
| **"Book Debts"** | all trade and other debts and amounts owing to the Seller at the Effective Time or which will become owing to the Seller with the passage of time in respect of goods or services provided by the Seller before the Effective Time in respect of the Business (whether or not at the Effective Time due and payable) including interest payable on those sums and the benefit of any security or guarantee for their payment but excluding the Intercompany Receivables. |
| **"Business"** | the business of design, manufacture and management of data centres using clean energy technologies and sustainable computing infrastructure carried on by the Seller as at the Effective Time. |
| **"Business Day"** | a day other than a Saturday, Sunday or public holiday in England when banks in London are open for business. |
| **"Business Information"** | All information (including documentation and electronic data) held by the Seller which is used in |

| | |
|---|---|
| | managing the business carried on at the Clyde Site, Ohio and Canada. |
| **"Business Intellectual Property Rights"** | means any of the following which are used or exploited by the Seller in connection with the Business: patents, utility models, petty patents, trade and service marks, design rights, trade names, service names, business names, copyrights, rights in the nature of copyright, resale rights, rental rights, lending rights, moral rights, database rights, semi-conductor topography rights, plant variety rights, know-how, rights in trade secrets and confidential information, rights protecting reputation and goodwill, rights in unfair competition and all other intellectual property rights and analogous rights as may exist anywhere in the world for the full term of the rights concerned together with all reversions, revivals, extensions and renewals of such rights (whether registered or not); all registrations and pending registrations relating to any such rights, the benefit of any pending applications for any such registrations and the right to apply for registrations of such rights; and all rights of action, powers or benefits belonging or accrued in relation to such rights (including the right to sue for and recover damages for past infringements). |
| **"Business Name"** | Lake Parime Limited. |
| **"Buyer's Solicitors"** | Taylor Wessing LLP of 5 New Street Square, London EC4A 3TW. |
| **"Claim"** | means any claim, action, proceeding or demand whether in contract, tort, breach of duty (statutory or otherwise), fraud or negligence howsoever arising. |
| **"Clyde Site"** | means the site located at Fruitgrowers Road, Clyde, New Zealand (Certificate of Title 149736). |
| **"Completion Date"** | the date of this Agreement. |
| **"Customer Data"** | the **personal data** (as defined in article 4(1) of the UK GDPR) of Customers which form part of the Customer Database. |
| **"Customer Database"** | the database owned by the Seller for the purpose of providing services to Customers. |

| | |
|---|---|
| **"Customers"** | the customers and former customers of the Seller in relation to the Business. |
| **"Data Controller"** | as defined in article 4(7) of the UK GDPR. |
| **"Data Employees"** | the Employees and all persons formerly employed by the Seller in the Business at any time before the Appointment Date. |
| **"Data Protection Legislation"** | the UK Data Protection Legislation and any other legislation applicable in any territory or jurisdiction in which the Business operates or has done so prior to the date of this Agreement relating to personal data and all other legislation and regulatory requirements in force from time to time which apply to a party relating to the use of personal data (including, without limitation, the privacy of electronic communications); and the guidance and codes of practice issued by the relevant data protection or supervisory authority and applicable to a party. |
| **"Dong Guan Free Issue Components"** | the custom power distribution assets known as "Dong Guan Free Issue Components" and understood to be located at (i) K Star 4/F, No.1 Building, Software Park, Keji C. Rd. 2nd, HiTech Industrial Zone, Shenzhen 518057; and (ii) the Clyde Site. |
| **"Effective Time"** | 8.00am on the Completion Date. |
| **"Employee Data"** | the **personal data** (as defined in article 4(1) of the UK GDPR) of the Data Employees which form part of the Employee Database. |
| **"Employee Database"** | the database owned by the Seller in connection with the Data Employees. |
| **"Employees"** | all persons employed by the Seller in the Business at or immediately before the Effective Time, whose details are set out in Schedule 4. |
| **"Employee Liability Information"** | in respect of each of the Employees:<br>(a) the identity and age of the Employee;<br>(b) the Employee's written statement of employment particulars (as required under section 1 of the Employment Rights Act |

| | |
|---|---|
| | 1996);<br><br>(c) information about any disciplinary action taken against the Employee and any grievances raised by the Employee, where a Code of Practice issued under Part IV of the Trade Union and Labour Relations (Consolidation) Act 1992 relating exclusively or primarily to the resolution of disputes or any other applicable code or statutory procedure applied, within the previous two years;<br><br>(d) information about any Claim either brought by the Employee against the Seller within the previous two years or where the Seller has reasonable grounds to believe that a Claim may be brought against the Buyer arising out of the Employee's employment with the Seller; and<br><br>(e) information about any collective agreement which will have effect after the Effective Time in relation to the Employee pursuant to regulation 5(a) of TUPE. |
| **"Encumbrance"** | any mortgage, charge (fixed or floating), pledge, finance lease, sale and lease-back, lien, hypothecation, guarantee, trust, right of set-off or other third party right or interest (legal or equitable) including any assignment by way of security, or other security interest of any kind, however created or arising, or any other agreement or arrangement (including a sale and repurchase agreement) having similar effect, and includes any agreement or arrangement to grant or create any of the foregoing. |
| **"Foresight Assets"** | the components / spare parts to MV7 miners |
| **"Excluded Assets"** | the property, rights and assets set out in clause 2.2 as being excluded from the sale and purchase under this Agreement. |
| **"Goodwill"** | the goodwill, custom and connection of the Seller in relation to the Business, together with the right for the Buyer to carry on the Business. |
| **"HMRC"** | HM Revenue & Customs. |

| | |
|---|---|
| **"Intellectual Property Licensing Agreements"** | all agreements, contracts and licences made between the Seller and third parties relating to the licensing of the Licensed Software. |
| **"Interest Rate"** | interest at a rate of 4% per annum above the base lending rate from time to time of Barclays Bank plc. |
| **"Intercompany Receivables"** | the LP AH Debt, the LP CAN Debt and the LP USA Debt. |
| **"K Star Powerbox Containers"** | the infrastructure containers produced by K Star and understood to be located at (i) K Star 4/F, No.1 Building, Software Park, Keji C. Rd. 2nd, HiTech Industrial Zone, Shenzhen 518057; and (ii) Clyde Dam, Clyde, South Island, New Zealand. |
| **"Licensed Software"** | any computer software used by the Seller in or in connection with the Business the copyright in which is not wholly owned by the Seller. |
| **Loan Note Agreement"** | the convertible loan note agreement entered into between Mr Ozer and the Seller on 24 September 2020. |
| **"Loss"** | any loss, damage, liability, cost, charge or expense (including any costs of enforcement) and "**Losses**" shall be construed accordingly. |
| **"LP AH"** | Lake Parime USA Asset Holdings, Inc., incorporated and registered in Delaware, United States of America with company number 6925192, whose principal office is at 3500 South Dupont Highway, Dover, De, 19901 |
| **"LP AH Debt"** | all amounts owed to the Seller by LP AH at the Effective Time, currently estimated to be £1,323.36. |
| **"LP AH Shares"** | 100% of the shares held by the Seller in LPAH at the Effective Time. |
| **"LP CAN"** | Lake Parime International Resources Limited, incorporated and registered in British Columbia, Canada with company number BC1247944, whose registered office is at 308 East 5th Avenue, Vancouver BC V5T 1H4. |

| | |
|---|---|
| **"LP CAN Debt"** | all amounts owed to the Seller by LP CAN at the Effective Time, currently estimated to be £1,072,193.85. |
| **"LP CAN Shares"** | 100% of the issued and outstanding shares held by the Seller in the capital of LP CAN at the Effective Time. |
| **"LP Head Office"** | the property occupied by the Seller at 1 Poultry, London, EC2R 8EJ. |
| **"LP USA"** | Lake Parime USA Inc. incorporated and registered in the State of Washington, United States of America, with company number 604 602 416 whose principal address is at 522 W Riverside Ave STE, 4212 Spokane, WA 99201-0580 |
| **"LP USA Debt"** | all amounts owed to the Seller by LP USA at the Effective Time, currently estimated to be £20,380,238.82. |
| **"LP USA Shares"** | 100% of the shares held by the Seller in LP USA at the Effective Time. |
| **"Office Equipment"** | all of the fixtures and fittings (other than the landlord's fixtures and fittings), furniture, utensils, templates, tooling, implements, chattels and equipment (including all tangible elements of any IT system) owned by the Seller in relation to the Business and situated at the Properties as at the Effective Time, including the items listed in Schedule 5, together with the benefit of any manufacturers' or suppliers' warranties in respect of such items, but not including the Stock. |
| **"Orkney Assets"** | any assets associated with the Orkney Operator Plan, including the bitcoin mining IT hardware unit known as "Antminer S9l". |
| **"Promotional Literature"** | all catalogues, price lists, sales information sheets and sales literature of the Seller relating to the Business. |
| **"Properties"** | together the Clyde Site and the LP Head Office. |
| **"Purchase Price"** | the consideration payable by the Buyer to the Seller under clause 3. |
| **"ROT Assets"** | all assets in the possession of the Seller at the Properties at the Effective Time that are or |

| | |
|---|---|
| | become subject to an ROT Claim. |
| **"ROT Claim"** | a claim made by a supplier of goods (or a person deriving title from such a supplier) delivered into the possession of the Buyer for the return of those goods, or for the payment of damages for wrongful interference with them, conversion of them or trespass to them, in each case on the basis that title to them had not passed to the Seller before such delivery. |
| **"Seller's Records"** | the books, accounts, lists of clients, Customers (including the Customer Database) and Suppliers, credit reports, cost records, work tickets, and all the other documents, papers and records (including the Employee Database and the Promotional Literature) however stored of the Seller exclusively relating to the Business, Employees or any of the Assets, but excluding the Administrators' Records and the VAT Records. |
| **"Seller's Solicitors"** | Keystone Law. |
| **"Shares"** | the LP USA Shares, the LP CAN Shares and the LP AH Shares. |
| **"Siemens Transformers"** | © transformers from Siemens and understood to be located at Siemens, 585 Slawin Court, Mount Prospect IL 60056, USA. |
| **"Stock"** | all finished goods, work-in-progress, stock-in-trade, raw materials, consumables and spare parts owned by the Seller in connection with the Business wherever situated as at the Effective Time. |
| **"Subsidiary"** | has the meaning given in clause 1.6. |
| **"Suppliers"** | the suppliers and former suppliers of goods or services to the Seller in relation to the Business (save that Landlords shall not be deemed to be Suppliers in respect of the Leases or good or services supplied under the Leases, nor shall Employees or former employees be deemed to be Suppliers in respect of their contracts of employment). |
| **"Target Contracts"** | the supplier and customer contracts associated with the Clyde Site, including those contracts listed |

| | |
|---|---|
| | in Schedule 2. |
| **"Target Fixed Assets"** | the fixed assets associated with operations at the Clyde Site, including without limitation fixed structures, housing, transformers, power distribution equipment, and other equipment, and in particular those assets listed in Schedule 3. |
| **“Taxation or Tax”** | all forms of taxation and statutory, governmental, state, federal, provincial, local, government or municipal charges, duties, imposts, contributions, levies, withholdings or liabilities wherever chargeable and whether of the UK or any other jurisdiction; and any penalty, fine, surcharge, interest, charges or costs relating thereto. |
| **“Third Party Assets”** | all assets in the possession of the Seller at the Properties in relation to the Business which are on loan, subject to lease, hire purchase, conditional sale, rental, contract hire or other agreements which do not pass title to the Seller, or of which it is for any reason bailee. |
| **“Third Party Consent”** | a consent, licence, approval, authorisation or waiver required from a third party for the conveyance, transfer, assignment or novation in favour of the Buyer (or either of them) of any of the Assets. |
| **“Transaction”** | the transaction contemplated by this Agreement or any part of that transaction. |
| **“TUPE”** | the Transfer of Undertakings (Protection of Employment) Regulations 2006 (*SI 2006/246*). |
| **"UK Assets"** | the Assets in respect of which the entry is marked as "Yes" in the column labelled "UK Asset?" in Schedule 1 to this Agreement, being Assets which are situated in the United Kingdom for VAT purposes. |
| **“UK Data Protection Legislation”** | all applicable data protection and privacy legislation in force from time to time in the UK including without limitation the UK GDPR, the Data Protection Act 2018 (and regulations made thereunder), the Privacy and Electronic Communications Regulations 2003 (*SI 2003/2426*) as amended and the guidance and codes of practice issued by the Information Commissioner |

| | |
|---|---|
| | that are applicable to a party. |
| **"UK GDPR"** | the General Data Protection Regulation 2016/679 as implemented into the law of the United Kingdom by the Data Protection, Privacy and Electronic Communications (Amendments etc) (EU Exit) Regulations 2019 and the Data Protection, Privacy and Electronic Communications (Amendments etc) (EU Exit) Regulations 2020 and the Data Protection Act 2018. |
| **"Unsecured Creditor Claims"** | the unsecured creditor claims of Mr Ozer proved against the Seller and which are admitted by the Administrators or any subsequently appointed Liquidator for any purposes |
| **"VAT"** | value added tax chargeable under the VATA 1994 or under any legislation replacing it or under any legislation which the VATA 1994 replaced and further means value added tax at the rate in force when the relevant supply is made and any tax of a similar nature which is introduced in substitution for or as an addition to such value added tax from time to time and any penalties, fines or interest in relation to them or any other tax of a similar nature imposed elsewhere. |
| **"VATA 1994"** | Value Added Tax Act 1994. |
| **"VAT Group"** | two or more persons registered as a group for VAT purposes under section 43 of the VATA 1994. |
| **"VAT Records"** | all records of the Seller relating to the Business and the Assets required to be preserved by virtue of paragraph 6 of Schedule 11 to VATA 1994. |
| **"Worker"** | a person who is not an Employee and who personally performs work for the Seller in the Business (whether directly or indirectly or through a service company) immediately before the Effective Time but who is not in business on their own account or in a client/customer relationship, whose details are set out in Schedule 4. |

1.2 Clause, Schedule and paragraph headings shall not affect the interpretation of this Agreement.

1.3 A **person** includes a natural person, corporate or unincorporated body (whether or not having separate legal personality).

1.4 The Schedules form part of this Agreement and shall have effect as if set out in full in the main body of this Agreement. Any reference to **this Agreement** includes the Schedules (and where used in the Schedules, includes a reference to each other Schedule and to the main body of this Agreement). In the event of any inconsistency between any provision set out in the main body of this Agreement and any provision set out in any Schedule, the provision in the main body of this Agreement shall prevail and words and expressions which are defined in any Schedule to give a different meaning to the meaning given to such words or expressions in the main body of this Agreement shall bear the meaning there given in construing such Schedule.

1.5 A reference to a **company** shall include any company, corporation or other body corporate, wherever and however incorporated or established.

1.6 A reference to a holding company or a subsidiary means a holding company or a subsidiary (as the case may be) as defined in section 1159 of the Companies Act 2006 and a company shall be treated, for the purposes only of the membership requirement contained in sections 1159(1)(b) and (c), as a member of another company even if its shares in that other company are registered in the name of (a) another person (or its nominee) by way of security or in connection with the taking of security, or (b) its nominee. In the case of a limited liability partnership which is a subsidiary of a company or another limited liability partnership, section 1159 of the Companies Act 2006 shall be amended so that: (a) references in sections 1159(1)(a) and (c) to voting rights are to the members' rights to vote on all or substantially all matters which are decided by a vote of the members of the limited liability partnership; and (b) the reference in section 1159(1)(b) to the right to appoint or remove a majority of its board of directors is to the right to appoint or remove members holding a majority of the voting rights.

1.7 Unless the context otherwise requires, words in the singular shall include the plural and words in the plural shall include the singular.

1.8 Unless the context otherwise requires, a reference to one gender shall include a reference to the other genders.

1.9 A reference to any party shall include that party's personal representatives, successors and permitted assigns.

1.10 Words and expressions defined for the purposes of or in connection with any statutory provisions shall, where the context so requires, be construed as having the same meanings in this Agreement.

1.11 Unless the context otherwise requires, a reference to legislation or legislative provision is a reference to it as in force as at the date of this Agreement and a reference to legislation or legislative provision shall include all subordinate legislation made as at the date of this Agreement under that legislation or legislative provision.

1.12 A reference to writing or written includes fax and email.

1.13 Where the words **include(s)**, **including** or **in particular** are used in this Agreement, they are deemed to have the words "without limitation" following them.

1.14 Any obligation in this Agreement on the Buyer not to do something includes an obligation on the Buyer not to agree or allow that thing to be done.

1.15 Any obligation in this Agreement on the Buyers to do something includes an obligation to do that thing at the Buyers' own cost and expense.

1.16 **Other** and **otherwise** are illustrative and shall not limit the sense of the words preceding them.

1.17 A reference to the **Seller or the Administrators** includes them jointly and each of them individually.

1.18 A reference to a Claim or Loss shall include any Claim or Loss that falls to be paid as a personal liability of the Administrators or an Administration Expense.

1.19 A reference to **records** includes information held in any form, including paper, electronically stored data, magnetic media, film and microfilm.

1.20 A reference to **representatives** includes partners, agents, employees, subcontractors and any other person acting on behalf and with the authority of a party.

1.21 A reference to a document **in the agreed form** is a reference to a document in the form agreed between the parties to this Agreement on or before the making of this Agreement and initialled by them for the purposes of identification.

## 2. Agreement to sell and purchase

2.1 Subject to the terms of this Agreement, the Seller shall sell and the Buyer, with a view to carrying on the Business as a going concern, shall purchase such right, title and interest (if any) as the Seller has and can transfer in the following assets as at the Effective Time:

2.1.1 the Shares;

2.1.2 the Intercompany Receivables;

2.1.3 the Intellectual Property Licensing Agreements;

2.1.4 the Business Information;

2.1.5 the Seller's Records;

2.1.6 the Goodwill;

2.1.7 the Business Intellectual Property Rights;

2.1.8 the Foresight Assets;

2.1.9 the K Star Powerbox Containers;

2.1.10 the Dong Guan Free Issue Components;

2.1.11 the Siemens Transformers;

2.1.12 the Office Equipment;

2.1.13 the Stock

2.1.14 the benefit subject to the burden of Target Contracts; and

2.1.15 the Target Fixed Assets.

2.2 For the avoidance of doubt and without limitation, the following items are not included in the sale under this Agreement:

2.2.1 the Book Debts;

2.2.2 the Administrators' Records;

2.2.3 the VAT Records;

2.2.4 the Third Party Assets;

2.2.5 the Orkney Assets;

2.2.6 the ROT Assets, except as provided in clause 9.5;

2.2.7 any cash in hand or at the bank;

2.2.8 any real property owned, leased or used by the Seller other than any property leased pursuant to the Target Contracts, including the Clyde Site;

2.2.9 all policies of insurance and assurance and any actual or potential claim under such policies or similar contracts or in damages against any third party;

2.2.10 the benefit of any actual or potential claim, or right to make a claim, against any person (other than claims under the manufacturers or suppliers' warranties included in the Assets) including the proceeds of any litigation;

2.2.11 any shares or other securities owned by the Seller other than the Shares; and

2.2.12 any other property, rights or assets of the Seller which are not listed in clause 2.1 or 2.2.

## 3. Purchase Price

3.1 The consideration for the sale and purchase of the Business and the Assets shall be:

3.1.1 the aggregate of the values attributed to the Assets set out in Schedule 1 (the "**Cash Consideration**"); and

3.1.2 a postponement of 70% of the Unsecured Creditor Claims by Mr Ozer in the manner set out at clause 3.5,

(together the **Purchase Price**).

3.2 The Cash Consideration shall be paid in cash on or before Asset Completion by the Buyer (or by Mr Ozer on behalf of the Buyer) to the Administrators' Solicitors or in such other manner as the Administrators may direct.

3.3 The Seller confirms that the Administrators or the Administrators' Solicitors may give a good receipt for all payments to the Seller.

3.4 The Cash Consideration shall be apportioned between the Assets in accordance with Schedule 1.

3.5 The Buyer shall procure and Mr Ozer has agreed to postpone 70% of his Unsecured Claim against the Seller until such time as all other unsecured claims against the Seller have been paid in full (including any statutory interest or other entitlements).

3.6 All monies payable by the Buyer under this Agreement shall be paid without set-off, counterclaim or deduction whatsoever.

## 4. Asset Completion

4.1 Asset Completion shall take place on the Completion Date immediately after the making of this Agreement at the offices of the Administrators' Solicitors or at such other place as the Administrators may direct.

4.2 At Asset Completion, the Buyer shall:

4.2.1 pay the Cash Consideration in respect of the Business and the Assets;

4.2.2 execute all documents delivered by the Seller which require execution by the Buyer.

4.3 At Asset Completion, subject to the Buyer having complied with clause 4.2 the Seller shall deliver, or procure delivery to the Buyer, or make available to the Buyer:

4.3.1 a duly executed instrument of transfer in respect of the LP CAN Shares in the agreed form;

4.3.2 stock transfer forms in the agreed form duly executed by the Seller, assigning to the Buyer the LP USA Shares and the LP AH Shares; and

4.3.3 a duly executed assignment in the agreed form of those Business Intellectual Property Rights that may be assigned by the Seller without the consent of any third party.

4.4 At Asset Completion, subject to the Buyer having complied with clause 4.2 the Seller shall use reasonable endeavours to procure delivery to the Buyer or make available to the Buyer:

4.4.1 instructions from LP USA and LP AH to their respective lawyers or other parties holding the share certificates representing the LP USA Shares and the LP AH Shares, to deliver up the originals of such share certificates to the Buyer;

4.4.2 physical possession of all the Assets to which title is capable of passing by delivery, at their then current locations;

4.4.3 physical possession of the ROT Assets and the Third Party Assets, at their then current locations, subject to the terms of clause 8 and clause 9; and

4.4.4 the Seller's Records at their current locations.

4.5 The Seller shall as soon as reasonably practicable after Asset Completion change its name to a name other than Lake Parime Limited, subject to the passing of a special resolution of the members of the Seller or compliance with the provisions of its articles of association that relate to the change of the Seller's name. For the avoidance of doubt, the Administrators shall have no obligation to procure the consent of the Seller's members to the change of the Seller's name nor to ensure compliance with the relevant provisions of its articles of association.

4.6 Without limitation of any other provision of this Agreement, from Asset Completion, the Buyer shall use reasonable endeavours do all things necessary to ensure compliance with all legal requirements as to possession, ownership or use of any of the Assets including obtaining all necessary licences, consents, certificates, permits and other authorisations.

4.7 The Buyer shall fully indemnify the Administrators from and against all Claims and Losses which may be brought against or incurred by the Administrators in respect of the Buyer’s failure to comply with clause4.6.

## 5. Passing of risk

The Business and the Assets shall be at the sole risk of the Buyer from Asset Completion.

## 6. Target Contracts

6.1 From Asset Completion, the Buyer shall perform all of the Seller's obligations and assume all of the Seller's liabilities under the Target Contracts, whether arising before or after the Effective Time save that the Buyer shall not have any obligation to the Seller to pay or discharge any liability of the Seller in respect of goods or services delivered to or performed for the Seller under any Target Contract before the Effective Time.

6.2 The Seller shall, with effect from the Asset Completion assign to the Buyer, or procure the assignment to the Buyer of, all the Target Contracts which are capable of assignment without a Third Party Consent.

6.3 If any of the Target Contracts cannot be assigned or novated without a Third Party Consent (to the extent such Third Party Consent has not been obtained prior to Asset Completion):

6.3.1 the Buyer shall, from Asset Completion, use its reasonable endeavours to obtain such consents;

6.3.2 the Buyer shall promptly provide copies of any such consents, assignments and novations to the Seller; and

6.3.3 the Seller shall, at the expense of the Buyer, execute such assignments and novations as the Buyer may reasonably require, subject to clause 25, and provided that each assignment or novation includes terms under which the Buyer undertakes to perform the contract and to be bound by the terms of it in every way as if the Buyer had been from the Effective Time a party in place of the Seller

6.4 Insofar as any of the Target Contracts cannot be assigned or novated to the Buyer without a Third Party Consent, and such consent is refused or otherwise not obtained or where any of such contracts is incapable of transfer to the Buyer by assignment, novation or other means, the Buyer shall (if sub-contracting is permissible and lawful under the contract in question), as the Seller's sub-contractor, perform all of the obligations of the Seller under such contract, and where sub-contracting is not permissible, the Buyer shall (if the Seller and the Administrator so request) perform such obligations as agent for the Seller.

6.5 Nothing in an assignment or novation under clause 6.2 or any sub-contracting arrangement under clause 6.4 shall, as between the Buyer and Seller, or as between the Seller and any other person, give rise to any obligation by the Seller or the Administrators to make any payment to the Buyer or any other person save where such payment is expressly contemplated in the following provisions of this clause 6.

6.6 Nothing in this Agreement shall be construed as an assignment or attempted assignment of a Target Contract if such assignment or attempted assignment would constitute a breach of that Target Contract.

6.7 Subject to the Buyer's performance of any of their obligations in respect of the Target Contracts under this clause 6, the Buyer shall be entitled to retain all benefits in respect of goods and services provided by the Buyer after the Effective Time under the Target Contracts arising in the period from the Effective Time until the date of assignment or novation.

6.8 Any prepayment or deposit under a Target Contract received by the Seller before the Effective Time (other than sums held on trust) shall remain the property of the Seller, and the Buyer shall not be entitled to any refund or other allowance in respect of it.

6.9 The amount of any prepayment or deposit paid by the Seller to a supplier under a Target Contract prior to the Effective Time in respect of goods or services which have not been supplied or provided to the Seller before the Effective Time shall be paid to the Seller by the Buyer (in addition to the Purchase Price) upon demand by the Seller or the Administrators (the Seller and Administrators being entitled to make more than one demand in respect of different amounts and Target Contracts).

6.10 Any sums held by or on behalf of the Seller as trustee for any Customer under a Target Contract shall be retained by the Seller for application in accordance with the trust. If the Buyer provides the Administrators with evidence satisfactory to them of the full performance of such a Target Contract, the Seller shall, if permitted do to so under the terms of the relevant trust, pay to the Buyer the relevant trust funds which will thereby be released from the trust.

6.11 The Buyer acknowledge that no warranty is given that the Seller has made payments when due under the Target Contracts and acknowledge that the risks arising from any such non-payment are those of the Buyer alone, and the Buyer shall not be entitled to any refund or allowance in respect of any such non-payment, whether such non-payment relates to a period before the Effective Time or otherwise.

6.12 The Buyer shall fully indemnify the Administrators from and against all Claims and Losses which may be brought against or incurred by the the Administrators in respect of the Target Contracts insofar as such matters relate to the period, or any event occurring, after the Effective Time and constitute an Administration Expense.

## 7. Intellectual property

7.1 The Buyer shall obtain any necessary third party licences, consents and permissions (**Permissions**) to use or exploit the Business Intellectual Property Rights. For the avoidance of doubt, the Seller does not authorise or purport to authorise the Buyer to use or exploit any Business Intellectual Property Rights before the Buyer obtains any such Permissions.

7.2 The Buyer shall be responsible for all registration, maintenance, renewal fees and other expenses in connection with the assignment, licensing and maintenance of the Business Intellectual Property Rights.

7.3 The Buyer shall fully indemnify the Seller and the Administrators from and against all Claims and Losses which may be brought against or incurred by Seller or the Administrators in respect of any or all of the Business Intellectual Property Rights insofar as such matters relate to the period, or any event occurring, after the Effective Time and constitute an Administration Expense.

## 8. Third Party Assets

8.1 The Seller shall leave the Third Party Assets on any of the Properties after Asset Completion.

8.2 The Buyer shall:

8.2.1 hold the Third Party Assets as bailee;

8.2.2 have no title to nor further right to possess or use any of the Third Party Assets;

8.2.3 not hold itself out as owner of any of the Third Party Assets;

8.2.4 at its own expense, maintain the Third Party Assets in as good condition as they were in at the time of Asset Completion (subject to normal wear and tear);

8.2.5 not sell, charge or otherwise encumber or dispose of any of the Third Party Assets; and

8.2.6 allow the Administrators, the Seller, the owners of the Third Party Assets and their respective representatives, to have access to the Third Party Assets at any reasonable time, to enable them to inspect, remove or otherwise deal with them.

8.3 The Buyer shall use all reasonable endeavours to obtain the consent of the owners of the Third Party Assets to the Buyer's continued possession, use or purchase of them. Neither the Administrators nor the Seller shall object to or hinder any arrangements which the Buyer may wish to make in this respect, provided that the Buyer shall not make any such arrangement with the owner or person entitled to such assets unless such arrangements include waivers in full of any claim which the owner may have against the Administrators (whether for conversion, trespass to goods or on any other account), and of any claim made as an Administration Expense for the payment of any monies in respect of such Third Party Assets or their use. Subject to this and to the requirements of clause 25, the Seller shall execute such documents as the Buyer may reasonably require and at the Buyer's expense.

8.4 If the owner of any Third Party Asset refuses to sell it or otherwise make it available to the Buyer, the Buyer shall as soon as reasonably practicable deliver up such item for collection and removal by the owner and notify the Seller of such delivery up.

8.5 The Buyer shall fully indemnify the Administrators from and against all Claims and Losses which may be brought against or incurred by the Administrators in respect of any or all of the Third Party Assets insofar as such matters relate to the period, or any event occurring, after the Effective Time and constitute an Administration Expense.

## 9. ROT Assets

9.1 The Seller shall leave the ROT Assets on any of the Properties after Asset Completion, and allow the Buyer into possession of the ROT Assets as against it.

9.2 The Buyer shall:

9.2.1 hold the ROT Assets as bailee;

9.2.2 have no title to nor further right to possess any of the ROT Assets;

9.2.3 not hold itself out as owner of any of the ROT Assets;

9.2.4 not charge or otherwise encumber any of the ROT Assets;

9.2.5 store, maintain and insure the ROT Assets at its own expense (subject to normal wear and tear);

9.2.6 allow the Administrators, the Seller, the owners of the ROT Assets and their respective representatives, to have access to the ROT Assets at any reasonable time, to enable them to inspect, remove or otherwise deal with them.

9.3 From Asset Completion, the Buyer shall promptly inform the Administrators and the Seller of any information received by it in respect of any ROT Claims.

9.4 The Buyer shall fully indemnify the Administrators from and against all Claims and Losses which may be brought against or incurred by the the Administrators in respect of any or all of the ROT Assets insofar as such matters relate to the period, or any event occurring, after the Effective Time and constitute an Administration Expense.

9.5 Where it is established by agreement between the Administrators and the relevant claimant or by court order that an ROT Claim is not valid and enforceable, such right, title and interest (if any) as the Seller has in the ROT Asset, the subject of that ROT Claim, will pass to the Buyer on the date of that agreement or court order.

**10. Book Debts**

10.1 For the avoidance of doubt and without limitation, the collection of the Book Debts shall remain the responsibility of the Seller, and the Buyer shall not seek to collect or recover the Book Debts or do anything to hinder their collection by the Seller. In particular, the Buyer shall not agree any discounts or compromise or otherwise settle any of the Book Debts.

10.2 If the Buyer receives any payment in respect of any Book Debt or any other sum due to the Seller, it shall hold the payment on trust for the benefit of the Seller and remit it to the Seller immediately on receipt.

10.3 If the Buyer receives a payment from a person who is a debtor of both the Seller and the Buyer and the payment is not otherwise specified as being in payment of a particular debt, the amount shall be first applied in respect of the debts due to the Seller, and the Buyer shall pay to the Seller an amount equal to the payment so received within 10 Business Days of becoming aware of such payment .

10.4 The Seller and the Administrators may take such action as they think fit in relation to the collection of the Book Debts, provided that:

10.4.1 the Seller undertakes not to commence proceedings or threaten the commencement of proceedings or to take any other steps (other than sending accounts rendered) with regard to any Book Debt owed to it by a person it knows to be a customer of the Buyer without first offering in writing to assign the relevant Book Debt to the Buyer at its face value. An offer made by the Seller under this clause 10.4.1 shall state the name of the debtor, and the age, amount and nature of the debt to be collected;

10.4.2 the Buyer may, within five Business Days of receipt of an offer made under clause 10.4.1, accept it by paying the full amount of the Book Debt specified in the offer

(including any specified interest or costs that the Seller is entitled to recover from the debtor) to the Seller; and

10.4.3 if the Buyer accepts the offer in accordance with clause 10.4.2, the Seller shall enter into an assignment of the relevant Book Debt to the Buyer in a form, excluding any personal liability of the Administrators and containing no warranties or representations as to title to or existence or quantum of the debt reasonably acceptable to the Seller and the Administrators.

10.5 The Buyer shall provide the Seller and the Administrators with such information as the Administrators may require to enable the Administrators to determine what remittances or payments are from time to time due to the Seller under this clause 10.

## 11. Employees

11.1 The parties agree that the sale and purchase pursuant to this Agreement will constitute a "relevant transfer" for the purposes of TUPE and that the contracts of employment of the Employees and the Seller's rights, powers, duties and liabilities under or in connection with such contracts of employment shall be transferred to the Buyer under TUPE at the Effective Time.

11.2 Neither the Seller nor the Administrators shall have any liability to the Buyer for any Claims or Losses which may be brought against or incurred by the Buyer whether relating to the period before or after the Effective Time in respect of any persons whose employment is transferred to the Buyer, whether under TUPE or otherwise.

11.3 The Administrators will advise the relevant Employees about the relevant statutory scheme in accordance with Regulation 8 of TUPE and the application that they make under such scheme.

11.4 The Buyer acknowledges that the Seller acting by its Administrators has, so far as practicable, provided it with the Employee Liability Information, and that, given the Administrators' limited knowledge of the Business and the insolvency of the Seller, such information may be incomplete or inaccurate.

11.5 The Buyer shall fully indemnify the Seller and the Administrators from and against all Claims and Losses which may be brought against or incurred by the Seller or the Administrators in respect of any of the Employees or Workers, whether in relation to periods before or after the Effective Time, including any claim brought by:

11.5.1 any of the Employees or any of the Workers;

11.5.2 the Buyer under regulation 12 of TUPE; or

11.5.3 any person under regulation 15 of TUPE.

11.6 If the contract of employment or for work of any Employee or Worker is found or alleged not to have transferred to the Buyer under TUPE with effect from the Effective Time, other than pursuant to any person exercising their right to opt out of the transfer, the Buyer agrees that:

11.6.1 it will within 2 Business Days of being informed of such fact make the relevant Employee or Worker an offer of employment in writing; and

11.6.2 any such offer of employment made by the Buyer will be on terms which are not materially different from that Employee's terms immediately before the Effective Time (save as to the identity of the employer).

On making that offer (or at any time after the offer should have been made if no offer is made), the Seller shall terminate the employment of the relevant Employee and the Buyer shall fully indemnify the Seller and the Administrators against all Claims and Losses which may be brought against or incurred by the Seller or the Administrators in respect of the employment of that Employee or Worker from the Effective Time until such termination and from the termination of such employment or engagement.

## 12. Apportionments and prepayments

12.1 The Buyer shall pay to the Seller the apportioned value of all payments made or liabilities incurred by the Seller or the Administrators in connection with the Business in respect of or relating to any period after the Effective Time. Such payments shall be deemed to accrue equally from day to day and shall be apportioned as at the Effective Time. The Buyer shall pay any such sum to the Seller in cash in such manner as the Administrators may direct within five Business Days of delivery to the Buyer of an invoice by the Seller or the Administrators.

12.2 For the avoidance of doubt, and except as expressly provided otherwise in this Agreement, the Seller has no obligation to the Buyer to pay or discharge any debt owed by it to any person, or to pay or discharge any claim or liability (including contingent claims and liabilities) outstanding against it or any of its assets.

12.3 For the avoidance of doubt and except as expressly provided otherwise in this Agreement, the Buyer shall pay, satisfy and discharge all debts and liabilities of the Business incurred on or after the Effective Time, and shall fully indemnify the Seller and the Administrators from and against all Claims and liabilities which may be brought against or incurred by the Seller or the Administrators in respect of such debts and liabilities.

12.4 Nothing in this Agreement shall oblige the Seller or the Administrators, as against the Buyer, to make any payment in respect of the Business and the Assets which becomes due, or has become due before the Effective Time or in respect of any period up to the Effective Time which has not been discharged before the Effective Time.

12.5 This clause 12 does not apply to, or in respect of any liabilities arising out of, the Target Contracts .

## 13. Taxation

13.1 All amounts payable (including, for avoidance of doubt, the postponement of the Unsecured Creditor Claims pursuant to Clause 3 above) by the Buyer pursuant to this Agreement are expressed exclusive of any VAT that may be chargeable thereon.

13.2 The Seller and the Buyer each acknowledge and agree that in respect of the UK Assets a business is being transferred as a going concern and that they intend that section 49(1) of the VATA 1994 and article 5 of the Value Added Tax (Special Provisions) Order 1995 (*SI 1995/1268*) (article 5) will apply to the sale of the UK Assets pursuant to this Agreement.

13.3 The Buyer warrants to and notifies the Seller and the Administrators that:

13.3.1 it (or the representative member of its VAT Group) is registered for VAT or liable to be registered under Schedule 1 to the VATA 1994 with effect from on or before Asset Completion;

13.3.2 it is purchasing the UK Assets as beneficial owner in order that it may carry on the business in relation to the UK Assets as a going concern in succession to the Seller; and

13.3.3 following Asset Completion, it intends to use the UK Assets to carry on the same kind of business as that carried on by the Seller before the Asset Completion.

13.4 If:

13.4.1 for any reason HMRC determines in writing that the Seller or the Administrators are required to account for VAT on the whole or any part of any sum payable under this Agreement in respect of the UK Assets, the Administrators shall procure delivery to the Buyer of a copy of that written determination and a valid and proper VAT invoice in respect of the VAT payable; and

13.4.2 the Seller or the Administrators are required to account for VAT on the whole or any part of any sum payable under this Agreement in respect of Assets other than the UK Assets, the Administrators shall procure delivery to the Buyer of a valid and proper VAT invoice in respect of the VAT payable.

13.5 Within seven Business Days of receipt of such items referred to in Clause 13.4, the Buyer shall pay to the Administrators:

13.5.1 a sum equal to the full amount of the VAT included in the invoice; and

13.5.2 any interest, penalty or surcharge due to late payment of such VAT, and shall fully indemnify the Seller and the Administrators from and against all claims and losses which may be brought against or incurred by the Seller or the Administrators in respect of such assessment or amount.

13.6 Provided that compliance with the terms of this Clause 13.6 does not prevent or delay conclusion of the administration of the Seller, if HMRC determines that any amount paid by the Buyer pursuant to Clause 13.5 was not properly chargeable, the recipient of the payment shall:

13.6.1 if the recipient has not accounted to HMRC for the payment after the ruling promptly, repay the amount to the Buyer; or

13.6.2 if the recipient has accounted to HMRC for the payment, use reasonable endeavours to obtain a refund of any such VAT (plus any interest payable by HMRC), and pay to the Buyer the amount of the refund and any interest when and to the extent received from HMRC after deduction of any costs (including tax) in respect of such refund or interest.

13.7 The Seller and the Buyer do not intend to make a joint application to HMRC for the Buyer to be registered for VAT under the VAT registration number of the Seller, under regulation 6(1)(d) of the VAT Regulations 1995 (SI 1995/2518).

13.8 In the event that any Tax shall become payable in respect of the Shares at any time after Asset Completion the Buyer agrees that it shall be solely liable and the Buyer shall indemnify the Administrators in respect of any such amounts that may become payable as far as such constitutes an Administration Expense.

## 14. Promotional Literature

The Buyer shall not use any of the Promotional Literature nor send any of it to any Customers or potential customers without first affixing stickers to it to ensure that such recipients are aware that they will be dealing and contracting with the Buyer and not the Seller or the Administrators.

## 15. Seller's Records

15.1 From Asset Completion, the Buyer shall make the Seller's Records available for inspection by the Seller, the Administrators and their representatives and provide to them reasonable facilities during normal business hours to inspect and copy (at the Seller's reasonable expense) the Seller's Records.

15.2 The Buyer shall:

15.2.1 to the extent reasonably practicable, keep the Seller's Records in good order and in good and safe condition, and insured for their full value; and

15.2.2 give the Administrators not less than one month's prior notice of any intended disposal or destruction of all or any of them.

15.3 To the extent that any material comes into the possession of the Buyer that is not Business Information or relevant to the ongoing requirements of the Business, the Buyer shall, on becoming aware of the material:

15.3.1 process such material in accordance with all applicable legislation (including Data Protection Legislation);

15.3.2 inform the Seller of the material; and

15.3.3 as agreed with the Seller and unless prohibited by any applicable law, destroy such material or return such material to the Seller.

15.4 For the avoidance of doubt, the Administrator's Records shall not be available to the Buyer for inspection or otherwise and if any of them come into the possession of the

Buyer, at Asset Completion or otherwise, it shall immediately notify the Administrators and deliver them to the Administrators on demand.

**16. Buyer's Records**

16.1 During normal business hours and on reasonable notice, the Buyer shall give the Seller, the Administrators and their representatives access to the premises, records and staff of the Buyer to enable the Seller and the Administrators to deal with:

16.1.1 collection of the Book Debts;

16.1.2 ascertainment of the sums payable under this Agreement; and

16.1.3 any other matters arising in connection with this Agreement or the administration of the Seller.

**17. VAT Records**

17.1 The Seller shall preserve and permit the Buyer reasonable access to (including the ability to inspect or make copies of at the Buyer's expense) the VAT Records for such period as may be required by law.

17.2 If any of the VAT Records (other than copies obtained pursuant to clause 17.1 above) come into the possession of the Buyer, at Asset Completion or otherwise, it shall notify the Administrators as soon as reasonably practicable after becoming aware of that possession and deliver them to the Administrators on demand.

**18. Data protection**

18.1 Notwithstanding any other provision of this Agreement the Buyer undertakes that, on receipt of the Customer Database and Employee Database on the Completion Date, they shall:

18.1.1 duly observe all of their obligations as a Data Controller under the Data Protection Legislation which arise in connection with processing Customer Data and Employee Data;

18.1.2 comply with the principles relating to processing of personal data set out in article 5(1) of the UK GDPR and, in particular, they shall process Customer Data and Employee Data fairly and lawfully and in accordance with applicable Data Protection Legislation;

18.1.3 provide an appropriate privacy notice (to the extent required by Data Protection Legislation) to Customers and Data Employees whose personal data will continue to be held in the Customer Database and Employee Database after the Completion Date; and

18.1.4 obtain, and at all times maintain, a notification under the Data Protection Legislation appropriate to their status as a Data Controller.

18.2 The Buyer shall fully indemnify the Seller and the Administrators from and against all Claims and Losses incurred by the Seller or the Administrators in respect of non-compliance with the Data Protection Legislation arising from the Buyer's processing of the Customer Data or Employee Data following the Completion Date, insofar as such matters constitute an Administration Expense.

**19. Business Name**

The Seller undertakes to the Buyer that it shall not use, or permit to be used, the Business Name or any combination of it with any other word or any other name closely resembling it after Asset Completion for the purposes of carrying on trade or business.

**20. Correspondence**

After Asset Completion, the Buyer shall as soon as reasonably practicable deliver to the Administrators all correspondence received addressed to the Seller or the Administrators.

**21. Administrators' liability and status of claims**

21.1 The Administrators act as agents for the Seller and neither they nor their representatives shall incur any personal liability in any circumstances whatever by virtue of this Agreement, nor in relation to any related matter or claim nor in respect of any transfer, assignment or other documents made pursuant to this Agreement.

21.2 The Administrators have entered into this Agreement in their personal capacities solely for the purpose of obtaining the benefit of the provisions in their favour.

21.3 No sums due from the Administrators or the Seller arising directly or indirectly out of the terms of this Agreement shall be charged or payable as a cost or expense of the administration or otherwise payable under paragraph 99(3) or 99(4) of Schedule B1 to the Insolvency Act 1986, but shall rank (if that claim is allowed by law to rank as an unsecured claim) only as an unsecured claim against the Seller. The Buyer waives its rights to any priority, and the benefit of any charge, conferred by paragraphs 99(3) and (4) of Schedule B1 to the Insolvency Act 1986 accordingly.

**22. Exclusions and Buyer warranty**

22.1 Subject to clause 22.5, all representations, warranties, conditions, guarantees and stipulations, express or implied, statutory, customary or otherwise in respect of the Assets and the Business or any of the rights, title and interests transferred or agreed to be transferred pursuant to this Agreement are expressly excluded (including warranties and conditions as to title, quiet possession, merchantable or satisfactory quality, fitness for purpose and description). Except as expressly set out in this Agreement, any lists contained in any schedule or annexure shall not constitute any warranty in respect of the Seller's ownership of the listed items or otherwise.

22.2 The Assets are sold in their condition and locations at the Effective Time and subject to all faults, liens, executions, distraints, encumbrances and claims of third parties; the expense of discharging which shall be the responsibility of the Buyer. Unless otherwise required by law (and then only to that extent), the Seller and the Administrators and each of them shall not be liable for any loss arising out of, or due to, or caused by any defect or deficiencies in any or all of the Assets.

22.3 The Buyer agrees that the terms and conditions of this Agreement and the exclusions and limitations contained in it are fair and reasonable having regard to the following:

22.3.1 that this is a sale by an insolvent company in circumstances where the Administrators' knowledge of the Business and Assets is limited and it is usual that no representations and warranties are given by or on behalf of the Seller or the Administrators;

22.3.2 that the Buyer has relied solely on its own opinions and the opinions of its professional advisors concerning the Assets, their quality, condition, description, fitness and suitability for any purpose, the possibility that some or all of them may have defects not apparent on inspection and examination, and the use it intends or proposes to put them to;

22.3.3 that the Buyer has agreed to purchase the Assets "as seen" in their present state and condition for a consideration which takes into account the risk to the Buyer represented by the parties' belief that the said exclusions and limitations are or would be recognised by the courts;

22.3.4 that the Buyer, its representatives and advisers have been given every opportunity it or they may wish to have to examine and inspect all or any of the Assets or any of them and all relevant documents relating to them.

22.4 The Buyer acknowledges that it has not entered into this Agreement in reliance upon any representations, agreements, statements or replies to specific enquiries (whether oral or written) made or alleged to have been made by the Seller, the Administrators or its or their representatives at any time.

22.5 Nothing in this Agreement operates to limit or exclude any liability for fraud or fraudulent misrepresentation..

22.6 The Buyer acknowledges that if:

22.6.1 the Seller does not have title or unencumbered title to any or all of the Assets;

22.6.2 the Buyer cannot exercise any right conferred or purported to be conferred on it by this Agreement; or

22.6.3 the Target Contracts (or any of them) shall have ended or been terminated before the Effective Time, whether because of the insolvency of the Seller, or breach by the Seller, or for any other reason;

this shall not be a ground or grounds for rescinding, avoiding or varying any or all of the provisions of this Agreement, or for any reduction in or repayment of any part of the consideration.

22.7 The Buyer warrants that:

22.7.1 it has full authority to enter into this Agreement;

22.7.2 all approvals required to be obtained under the Companies Act 2006 or any other enactment to enable it lawfully to enter into this Agreement have been duly obtained;

22.7.3 the Buyer is not a person connected (within the meaning of section 252 of the Companies Act 2006) with a director of the Seller or of any holding company of the Seller or, if it is so connected, a resolution of the Buyer has been passed in accordance with sections 190, 191 and 223(1) of the Companies Act 2006 or no such resolution is required by virtue of section 192 of that Act;

22.7.4 the Buyer is not a connected person in relation to the Seller within paragraph 60A of Schedule B1 to the Insolvency Act 1986; and

and the Buyer agrees to indemnify the Seller and the Administrators from and against all liabilities arising as a result of any breach of this warranty.

## 23. Time of essence

Time is of the essence for all times, dates and periods specified in this Agreement or substituted for them.

## 24. Confidentiality and announcements

24.1 The Seller and the Administrators undertake to the Buyer to keep confidential all the information that they have acquired about the Buyer and to use such information only for the purposes contemplated by this Agreement.

24.2 The Buyer undertakes to the Seller and the Administrators to keep confidential the terms of this Agreement and all information that it has acquired about the Seller and to use the information only for the purposes contemplated by this Agreement.

24.3 Either party may disclose any information that it is otherwise required to keep confidential under this clause 24:

24.3.1 to such professional advisers, consultants and employees or officers of its group and, in the case of the Seller and the Administrators, the Administrators' firm, employees and agents, as are reasonably necessary to advise on this Agreement, or to facilitate the Transaction, provided that the disclosing party procures that the people to whom the information is disclosed keep it confidential as if they were that party;

24.3.2 with the written consent of the Administrators and the Buyer; or

24.3.3 to the extent that the disclosure:

24.3.3.1 is required for the purposes of the administration or any subsequent liquidation of the Seller;

24.3.3.2 is required by law; or

24.3.3.3 is required by a regulatory body, tax authority or securities exchange or (in the case of a disclosure by the Seller or the Administrators) is required in the Administrators' opinion to enable them to comply with any applicable requirements of insolvency practice or disclosure requirement to which they are subject (whether as a matter of law, practice or professional conduct);

but shall use reasonable endeavours to consult the Administrators (in the case of a disclosure on the part of the Buyer) or the Buyer (in the case of a disclosure on the part of the Seller or the Administrators) and to take into account any reasonable requests it may have in relation to the disclosure before making it.

24.4 No announcement, circular or other publicity in connection with the subject matter of this Agreement (other than as permitted by this Agreement) shall be made by or on behalf of the Seller, the Administrators or the Buyer without the approval of the Administrators and the Buyer (such approval not to be unreasonably withheld or delayed).

## 25. Further assurance

25.1 For six months following Asset Completion, the Seller and the Administrators (provided they are, at the relevant time, the Administrators of the Seller) shall (at the Buyer’s expense) execute and deliver all such documents, and do whatever the Buyer may from time to time reasonably require for the purpose of giving effect to the provisions of this Agreement, provided that the terms of any such documents and the terms on which any such things are performed:

25.1.1 shall exclude the personal liability of the Administrators;

25.1.2 shall be no more onerous to the Seller and the Administrators than the terms of this Agreement; and

25.1.3 shall be subject to the Administrators' prior approval, which shall not be unreasonably withheld or delayed.

25.2 Pending the execution of any documents and things in accordance with clause 25.1, the Seller shall hold any legal interest in the Assets on trust for the Buyer but without any legal responsibility for the Assets and, in particular, neither the Seller nor the Administrators shall be obliged to maintain any registrations or otherwise protect the Assets.

## 26. Assignment

The Buyer may not assign or grant any Encumbrance over or deal in any way with any of its rights under this Agreement or any document referred to in it.

**27. Whole agreement**

This Agreement, and any documents referred to in it, constitute the whole agreement between the parties and supersede any previous arrangement, understanding or agreement between them relating to the subject matter they cover.

**28. Variation**

28.1 A variation of this Agreement shall be in writing and signed by or on behalf of each party.

28.2 Any waiver by or on behalf of the Seller or the Administrators of any right under this Agreement is only effective if it is in writing and signed by the Administrators on behalf of the Sellers or the Administrators on their own behalf. It applies only in the circumstances for which it is given and shall not prevent the Seller or the Administrators from subsequently relying on the provision so waived.

28.3 No failure by the Seller or the Administrators to exercise or delay in exercising any right or remedy provided under this Agreement or by law constitutes a waiver of such right or remedy or shall prevent any future exercise in whole or in part.

28.4 No single or partial exercise by the Seller or the Administrators of any right or remedy under this Agreement shall preclude or restrict the further exercise of any such right or remedy.

28.5 Unless specifically provided otherwise, the rights of the Seller and the Administrators arising under this Agreement are cumulative and do not exclude rights provided by law.

**29. Costs**

Except as expressly provided in this Agreement, each party shall pay its own costs incurred in connection with the negotiation, preparation, and execution of this Agreement and any documents referred to in it.

**30. Notice**

30.1 A notice given under this Agreement:

30.1.1 shall be in writing;

30.1.2 shall be sent for the attention of the person, and to the address or email address, given in this clause 30 (or such other address, email address or person as the relevant party may notify to the party); and

30.1.3 shall be:

30.1.3.1 delivered personally;

30.1.3.2 delivered by commercial courier;

30.1.3.3 sent by prepaid first-class post or recorded delivery; or

30.1.3.4 (if the notice is served by post outside the country from which it is sent) sent by registered airmail.

30.2 The addresses for service of notice are:

30.2.1 SELLER AND ADMINISTRATORS

Address: 10 Fleet Place, London, EC2Y 7RB

For the attention of: Ed Boyle and Will Wright

Email address: ed.boyle@interpathadvisory.com and will.wright@interpathadvisory.com

30.2.2 BUYER

Address: 5 New Street Square, London, United Kingdom, EC4A 3TW

For the attention of: Ron Ozer and Jesper Ohlenschlager

Email address: ronozer@gmail.com and joe@btcn.dk

30.2.3 Mr OZER

Address: 1111 Bricknell Avenue, Suite 2650, Miami, Florida 33131 United States of America

Email address: ronozer@gmail.com

30.3 Any notice given shall be deemed to have been received:

30.3.1 if delivered personally, at the time of delivery;

30.3.2 if delivered by commercial courier, at the time of signature of the courier's receipt;

30.3.3 if sent by email, at the time when it arrives at the relevant server serving the relevant email addresses and provided no "undelivered" notification is generated upon such receipt, except that if that time is between 5.30 p.m. on a Business Day and 9.00 a.m. on the next Business Day it shall be deemed to have been served at 9.00 a.m. on the second of such Business Days;

30.3.4 if sent by prepaid first class post, recorded delivery or registered post, 48 hours from the date of posting;

30.3.5 if sent by registered airmail, five days from the date of posting; or

30.3.6 if deemed receipt under the previous paragraphs of this clause 30.3 is not within business hours (meaning 9.00 am to 5.30 pm Monday to Friday on a Business Day), when business next starts in the place of receipt.

30.4 To prove service by the Seller or the Administrators on the Buyer, it shall be sufficient to prove that the email was sent by email to the email address of the Buyer or, in the case of post, that the envelope containing the notice was properly addressed and posted.

**31. Interest on late payment**

31.1 If the Buyer fails to make any payment due to the Seller under this Agreement by the due date for payment, then the Buyer shall pay interest on the overdue amount at the Interest Rate. Such interest shall accrue on a daily basis from the due date until actual payment of the overdue amount, whether before or after judgment. The Buyer shall pay the interest together with the overdue amount.

**32. Severance**

32.1 If any provision or part-provision of this Agreement is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision under this clause shall not affect the validity and enforceability of the rest of this Agreement.

32.2 If any provision or part-provision of this Agreement is invalid, illegal or unenforceable, the parties shall negotiate in good faith to amend such provision so that, as amended, it is legal, valid and enforceable, and, to the greatest extent possible, achieves the intended commercial result of the original provision.

**33. Contra proferentem**

The parties acknowledge and agree that this Agreement has been drafted with the participation of all of the parties to it, in each case with the benefit of legal advice, and that the rule of construction known as "contra proferentem" shall not apply.

**34. Agreement survives Asset Completion**

34.1 Subject to clause 34.2, this Agreement (other than obligations that have already been fully performed) remains in full force after Asset Completion.

34.2 All obligations of the Seller and the Administrators under this Agreement shall automatically determine three months after Asset Completion.

**35. Third party rights**

35.1 The Administrators' representatives may enforce and rely on clause 21 to the same extent as if they were a party to this Agreement.

35.2 Except as expressly provided in clause 35.1, a person who is not a party to this Agreement shall not have any rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement.

35.3 The rights of the parties to terminate, rescind or agree any variation, waiver or settlement under this Agreement are not subject to the consent of any other person.

**36. Successors**

The rights and obligations of the parties shall continue for the benefit of, and shall be binding on, their respective successors and[permitted assigns and any subsequently appointed liquidator .

**37. Counterparts**

37.1 This Agreement may be executed in any number of counterparts, each of which when executed shall constitute a duplicate original, but all the counterparts shall together constitute the one agreement.

37.2 Transmission of an executed counterpart of this Agreement (but for the avoidance of doubt not just a signature page) **OR** the executed signature page of a counterpart of this Agreement by (a) fax or (b) email (in PDF, JPEG or other agreed format) shall take effect as delivery of an executed counterpart of this Agreement. If either method of delivery is adopted, without prejudice to the validity of the agreement thus made, each party shall provide the others with the original of such counterpart as soon as reasonably possible thereafter.

**38. Language**

38.1 This Agreement is drafted in the English language. If this Agreement is translated into any other language, the English language version shall prevail.

38.2 Any notice given under or in connection with this Agreement shall be in the English language. All other documents provided under or in connection with this Agreement shall be in the English language or accompanied by a certified English translation. If such document is translated into any other language, the English language version shall prevail.

**39. Governing law and jurisdiction**

This Agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the law of England and Wales.

**40. Jurisdiction**

Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with

this Agreement or its subject matter or formation (including non-contractual disputes or claims).

This Agreement has been entered into on the date stated at the beginning of it.

**Schedule 1**
**Values of Assets**

The values of the Assets are as follows:

| ASSET/PROPERTY | PRICE APPORTIONMENT | UK Asset? |
|---|---|---|
| the Target Contracts: | £1 | No |
| the Target Fixed Assets: | £1 | No |
| the Intellectual Property Licensing Agreements | £1 | Yes |
| The Office Equipment: | £40,000 | Yes |
| The Stock | £1 | Yes |
| the Shares: | the LP USA Shares: £1 | Yes |
| | the LP CAN Shares: £1 | Yes |
| | the LP AH Shares: £1 | Yes |
| Intercompany Receivables: | LP CAN Debt: £100,000 | Yes |
| | LP USA Debt: £1,259,987 | Yes |
| | LP AH Debt: £1 | Yes |
| the Business Information; | £1 | Yes |
| the Seller's Records: | £1 | Yes |
| the Goodwill: | £1 | Yes |
| the Business Intellectual Property Rights: | £99,998 | Yes |
| the Foresight Assets: | £1 | Yes |
| the K Star Powerbox Containers: | £1 | Yes |
| the Dong Guan Free Issue Components: | £1 | Yes |
| The Siemens Transformers: | £1 | Yes |

| | | |
|---|---|---|
| **TOTAL** | **£1,500,000.00** | |

## Schedule 2: Target Contracts

1. Ground Lease relating to the Clyde Site dated 5 August 2021 between the Seller and Contact Energy Limited.

2. Hash Power Sourcing Agreement dated 27 July 2022 between the Seller and Minodo Ltd.

3. ASIC Hosting Agreement dated 27 July 2022 between the Seller and Bitfield NV.

4. Data Centre Development and Electricity Supply Agreement dated 16 July 2021 among the Seller, Contact Energy Limited and Simply Energy Limited, as varied by a variation agreement dated 14 August 2022.

## Schedule 3: Target Fixed Assets

1. 8* POWERBOX DC-1500
2. 8* POWERDOCK LV
3. 2* PDU
4. 8* PCB
5. POE (S1730S-S48P4S-A1)
6. 2* Non-POE (S1730S-S48T4S-A1)
7. 73* ANALOGUE OUTPUT MODULE
8. 8* K Star Powerbox - Contact Energy (Clyde)
9. 8* K Star LV Kiosk - Contact Energy (Clyde)
10. 8* Dong Guan Free Issue Components (Clyde)

## Schedule 4: The Employees

### Part 1 – Employees

1. Sathesan Ganesarajah
2. Freyja Yeatman Omarsdottir
3. Chae Alexander Barkley Gordon
4. Natasha Jade Medlen
5. Seung-June Han
6. Kunal Kathane
7. Michael Finlay Brown
8. Nimesh Mistry
9. Stephen Nicholas Pappas
10. Iacopo Leonardo Gil Casas
11. Oliver James Godfrey Goodman
12. Li Zhe Lai
13. David Alan Edwards
14. Mairead Kenny
15. Akinkunmi Kasopefoluwa Oladeji
16. Tarun Bose

### Part 2 – Workers

1. Itai Almog
2. Badar Ayaz

## Schedule 5
## Office Equipment

| Description | Asset code |
| --- | --- |
| Dell Optical Mouse-MS116 - Black | FAR000001 |
| Dell Professional Briefcase 15 | FAR000001 |
| Dell 24 Gaming Monitor - SE2417HG - 60cm(23.6") Black UK | FAR000001 |
| Dell Latitude 5590 BTX | FAR000002 |
| Dell Latitude 5590 BTX | FAR000002 |
| Dell 24 Gaming Monitor - SE2417HG - 60cm(23.6") Black UK | FAR000003 |
| OptiPlex 7060 Small Form Factor BTX | FAR000004 |
| Dell Laptop | FAR000005 |
| Apple | FAR000005 |
| Antminer Bitcoin Machine | FAR000005 |
| Apple Pen | FAR000005 |
| MSI H270 | FAR000005 |
| Microsoft keyboard | FAR000005 |
| Intel temp sensor | FAR000005 |
| EVGA keyboard | FAR000005 |
| Thermaltake Core | FAR000005 |
| Gigabyte NVID | FAR000005 |
| Junnchen | FAR000005 |
| Junnchen | FAR000005 |
| Dell 24 Gaming Monitor - SE2417HG - 60cm(23.6") Black UK | FAR000006 |
| Latitude 5500 BTX Base | FAR000007 |
| URBO Stand in desk | FAR000008 |
| Dell 24 Gaming Monitor - SE2417HG - 60cm(23.6") Black UK | FAR000009 |

| | |
|---|---|
| Mouse | FAR000007 |
| OptiPlex 7070 Micro BTX | FAR000010 |
| Dell 24 Gaming Monitor - SE2417HG - 60cm(23.6") Black UK | FAR000010 |
| • Microsoft Wired Keyboard 600, UK Layout - Black | FAR000011 |
| Cables | FAR000012/13 |
| 13-inch MacBook Pro - Space Grey | FAR000014 |
| 2 * Surface Go Type Cover for Business - QWERTY | FAR000015 |
| 2 * Surface Go 2 for Business - WiFi, Intel Pentium 4425Y, 4GB, 64GB | FAR000015 |
| 2 * Surface Pen – Black | FAR000015 |
| Surface USB-C to Ethernet and USB Adaptor | FAR000015 |
| 2 * UAG Metropolis Surface Go Case | FAR000015 |
| Dell Monitors (4) | FAR000016 |
| Surface Pro Lap Top (7) | FAR000017 |
| Surface Mice (7) | FAR000017 |
| Surface Dock (7) | FAR000017 |
| USB Cable (14) | FAR000018 |
| Surface Pro Lap Top - Poppy Red | FAR000019 |
| Surface Pro Cover | FAR000019 |
| Surface Pro Pen | FAR000019 |
| USB Keyboard | FAR000020 |
| USB Console | FAR000020 |
| USB Card Reader | FAR000020 |
| Lenovo Mouse (5) | FAR000021 |
| Thinkpad Sleeve (5) | FAR000021 |
| Thinkpad X1 Carbon Gen 8 (5) plus warranty | FAR000021 |

| | |
|---|---|
| ThinkVision Monitor | FAR000021 |
| Thinkpad Hybrid USB Dock (4) | FAR000021 |
| Thinkpad X1 Yoga Gen 5 (3) | FAR000021 |
| Thinkpad Sleeve (1) | FAR000022 |
| Lenovo Slim DVD Burner DB65 | FAR000022 |
| Lenovo Adjustable Notebook Stand | FAR000022 |
| | |
| EZ - Laptop (Lenovo X1 Carbon Gen 9 Custom) | FAR000023 |
| EZ - Laptop (Lenovo X1 Carbon Gen 9 Custom) | FAR000024 |
| | |
| Lenovo ThinkPad X1 Yoga Gen 6 20XY - Flip design - Core i5 | FAR000025 |
| FAR000026 - Jabra Evolve 20 SE Stereo Headset | FAR000026 |
| Lenovo X1 Extreme Gen 2 | FAR000027 |
| Lenovo X1 Carbon Gen 9 Custom Build (2) | FAR000028 |
| Jabra Speak 510 (USB Cable / Bluetooth / UNC) | FAR000029 |
| Extra Long Reach TV Bracket 32"- 65" TV | FAR000029 |
| Samsung UE50AU7100KXXU - 50" AU7100 4K Ultra HD Smart TV | FAR000029 |
| 1080P Full HD USB Web Cam, 110 Wide Angle, Denoising Mic, | FAR000029 |
| 10m HDMI Cable Male To Male - V1.4 | FAR000029 |
| Lenovo X1 Carbon Gen 9 Custom Build | FAR000030 |
| Philips 27" IPS Screen - HDMI / VGA / Display Port | FAR000031 |
| Dual Arm PC Monitor Mount, | FAR000031 |
| Lenovo ThinkPad X1 Yoga Gen 6 20XY | FAR000031 |
| 2 Meter Display Port To Display Port | FAR000031 |
| Lenovo ThinkPad USB-C Dock Gen2 | FAR000031 |

| | |
|---|---|
| Lenovo Wireless Ultra Slim Desktop | FAR000031 |
| Single Arm PC Monitor Mount | FAR000031 |
| Lenovo ThinkPad X1 Yoga Gen 6 20XY | FAR000031 |
| Lenovo ThinkPad USB-C Dock Gen2 | FAR000032 |
| Lenovo ThinkPad X1 Yoga Gen 6 20XY | FAR000032 |
| Philips 27" IPS Screen - HDMI / VGA / Display Port | FAR000032 |
| 2 Meter Display Port To Display Port | FAR000032 |
| Philips 27" IPS Screen - HDMI / VGA / Display Port` | FAR000033 |
| Single Arm PC Monitor Mount, | FAR000033 |
| ZYXEL GS1920-48HPV2 48 Ports Manageable Ethernet Switch Warranty 48 Ports | FAR000034 |
| Dell Broadcom 5720 Dual Port 1Gigabit Network Interface Card | FAR000034 |
| Philips 27" IPS Screen - HDMI / VGA / Display Port | FAR000035 |
| Lenovo ThinkPad X1 Yoga Gen 6 Pen, | FAR000035 |
| ZYXEL GS1920-48HPV2 48 Ports Manageable Ethernet Switch - 4 Layer Supported - Modular - Twisted Pair, Optical Fiber - Rack-mountable - Lifetime Limited Warranty | FAR000036 |
| JABRA | FAR000037 |
| EZ HARDWARE - Lenovo Thinkpad Sleeve 14" | FAR000038 |
| EZ HARDWARE - Lenovo Stand, Height Adjustable Laptop Riser | FAR000038 |
| EZ HARDWARE - Lenovo Wireless Ultra Slim Desktop | FAR000038 |
| EZ HARDWARE - Delivery charge | FAR000038 |
| EZ HARDWARE - Ell PS722H 27" 1920x1080 5ms, Heaght Adjustable | FAR000038 |
| EZ HARDWARE - Lenovo ThinkPad USB-C Dock Gen2 | FAR000038 |

| | |
|---|---|
| EZ HARDWARE - Lenovo ThinkPad X1 Yoga Gen 6 20XY - Flip Design | FAR000038 |
| EZ HARDWARE - Lenovo ThinkPad X1 Yoga Gen 6 20XY - Flip Design | FAR000039 |
| EZ HARDWARE - Lenovo Essential Wireless Mouse, 65w USB-C Adapter, Delivery | FAR000039 |
| EZ HARDWARE - Lenovo ThinkPad X1 Yoga Gen 6 20XY - Flip Design | FAR000040 |
| EZ HARDWARE - 2020 Apple Macbook Pro 13" Touch Bar, Intel Core i5, 16GB RAM | FAR000040 |
| EZ HARDWARE - Lenovo ThinkVision T27-q-20,686cm | FAR000040 |
| EZ HARDWARE - Jabra Evolve 40 MS - USB & 3.5", Leather | FAR000040 |
| EZ HARDWARE - Phillips 27" IPS Screen - HDMI / VGA / Display Port | FAR000040 |
| EZ HARDWARE - standard delivery | FAR000040 |
| EZ HARDWARE - Dell P2719h 27" Full HD IPS Monitor | FAR000041 |
| EZ HARDWARE - Laptop Stand, Height Adjustable Laptop Riser | FAR000042 |
| EZ HARDWARE - Industrial MINI PC - Q370G4 / i7-4500U / 8GB / 256GB / 4 Port | FAR000044 |
| AMAZON - Jabra Evolve 20 SE Stereo Headset - Microsoft Certified Headphones | FAR000043 |
| Lenovo X1 Carbon Gen 9 Custom Build / Lenovo Wireless Ultra Slim Desktop / Thinkpad USB-C Gen 2 Dock | FAR000045 |
| Lenovo X1 Carbon Gen 9 Custom Build / Lenovo Wireless Ultra Slim Desktop / Thinkpad USB-C Gen 2 Dock | FAR000046 |

| | |
|---|---|
| Lenovo ThinkPad X1 Yoga Gen 6 20XY - Flip design - Core i5 1135G7 / 2.4 GHz - Evo - Win 10 Pro 64-bit - 16 GB RAM - 512 GB SSD TCG Opal Encryption 2, NVMe - 14" IPS touchscreen 1920 x 1200 - Iris Xe Graphics - NFC, Wi-Fi 6, Bluetooth - 4G - storm grey - kbd: UK Warranty : 3Y Premier support with on-site NBD | FAR000047 |
| AMAZON - Jabra Evolve 20 SE Stereo Headset - Microsoft Certified Headphones | FAR00048 |
| EZ HARDWARE - Thinkpad USB-C Gen 2 Dock | FAR000050 |
| EZ HARDWARE - Lenovo Essential Wireless Mouse | FAR000050 |
| EZ HARDWARE - Invision Single Monitor Arm - MX150 | FAR000050 |
| EZ HARDWARE - Invision Dual Monitor Arm - MX300 | FAR000050 |
| EZ HARDWARE - Standard Delivery To Head Office | FAR000050 |
| EZ HARDWARE - Dell P2719H 27" Full HD IPS Monitor | FAR000050 |
| EZ HARDWARE - Standard Delivery | FAR000050 |
| EZ HARDWARE - Dell P2722H 27" Full HD IPS Monitor | FAR000051 |
| EZ HARDWARE - Large Next Day Pallet Delivery | FAR000051 |
| EZ HARDWARE - Thinkpad USB-C Gen 2 Dock | FAR000052 |
| EZ HARDWARE - Standard Delivery To Head Office | FAR000052 |
| EZ HARDWARE - Onsite Client Support: Onsite Support Helping With Office Move | FAR000052 |
| EZ HARDWARE - Lenovo ThinkPad X1 Yoga Gen | FAR000053 |
| EZ HARDWARE - Standard Delivery | FAR000053 |
| LAPTOPS DIRECT - Lenovo ThinkPad X1 Yoga Core i5-1135G7 16GB 256GB SSD 14 Inch Windows 10 Pro Laptop (5X) | FAR000054 |

| | |
|---|---|
| 15 x Jabra Evolve 20 SE Stereo Headset - Microsoft Certified Headphones for VoIP Softphone with Passive Noise Cancellation | FAR000055 |
| Lenovo ThinkPad X1 Yoga Core i5-1135G7 16GB 256GB SSD 14 Inch Windows 10 Pro Laptop | FAR000056 |
| Lenovo Wireless Ultra Slim Desktop Wireless Keyboard & Optical Mouse (5) | FAR000057 |
| Thinkvision P27q-20 27" Serial Number: SV9086GG0 | FAR000057 |
| Delivery | FAR000057 |
| Shelving with extra large steel shelves | FAR000058 |
| Additional sheld leves | FAR000058 |
| Thinkpad USB-C Gen 2 Dock S/N: ZKW2LV6R | FAR000059 |
| Lenovo ThinkPad X1 Yoga Gen 6 S/N: PF3A5DCP / PF3A5GCE | FAR000059 |
| Standard Delivery | FAR000059 |
| Samsung UE50AU7100KXXU - 50" AU7100 4K Ultra HD Smart TV S/N: 0HAE3HFRA00271 | FAR000059 |
| 1080P Full HD USB Web Cam, 110 Wide Angle, Denoising Mic, Privacy Cover, 5MP, USB 2.0, Black S/N: X001CBFB9T | FAR000059 |
| Jabra Speak 510 (USB Cable / Bluetooth / UNC) S/N: 00039184179 | FAR000059 |
| Lenovo Wireless Ultra Slim Desktop | FAR000059 |
| Lenovo Wireless Ultra Slim Desktop Wireless Keyboard & Optical Mouse | FAR000060 |
| Laptop Height Adjustable Stand - Black | FAR000060 |
| Standard Delivery To Head Office | FAR000060 |

| | |
|---|---|
| Lenovo Thinkpad Essential Wireless Mouse (10) | FAR000061 |
| Mini Hazardous Substance Cabinets 457 x 457 x 305mm 1 Shelves 5Ltr | FAR000062 |
| MikroTik RouterBoard 3011UiAS-RM | FAR000063 |
| ThinkPad Thunderbolt 3 Dock Gen 2 | FAR000064 |
| Height Adjustable Laptop Stand - Black | FAR000064 |
| Standard Delivery | FAR000064 |
| Lenovo ThinkPad X1 Yoga Gen | FAR000065 |
| ThinkPad Thunderbolt 3 Dock Gen 2 | FAR000065 |
| Standard Delivery | FAR000065 |
| Lenovo ThinkPad X1 Yoga Gen 6 | FAR000066 |
| Standard Delivery | FAR000066 |
| Thinkpad P15 Gen 2 | FAR000067 |
| Standard delivery | FAR000067 |
| AMAZON - Brother CZ-1004 Zero-Ink Roll Cassette, Continuous Length | FAR000068 |
| AMAZON - Brother VC-500W Colour Label Maker, ZINK (Zero Ink) Design 'n' Craft Label Printer, Desktop, Up to 50mm Labels | FAR000068 |
| BITO STORAGE SYS - Mini Hazardous Substance Cabinets | FAR000069 |

| | |
|---|---|
| AMAZON - Jabra Evolve 20 SE Stereo Headset | PI000756 |
| AMAZON - SANON Voltage To Current Signal Module 0-5V To 4-20MA Module Voltage Transmitter Signal Converter Board Built-in | PI000780 |
| TRESTON - Workbench frame/LCD Screen holder/Power Module/Workplace Chair/Drawer Unit | FAR000070 |
| EZ HARDWARE - Lenovo ThinkPad x1 Yoga Gen 6 | FAR000071 |
| EZ HARDWARE - Industrial MINI PC - Q370G4 / i7-4500U / 8GB / 256GB / 4 Port LAN / No WiFi | FAR000072 |
| EZ HARDWARE - Lenovo ThinkPad X1 Yoga Gen 6 | FAR000073 |
| AMAZON - PropVue Projector Screen with Stand 60 inch - Indoor and Outdoor Projection Screen for Movie or Office Presentation | FAR000074 |
| FURNITURE @ WORK - Probe industril 9 compartment C/board | PI000963 |
| MikroTik 3011UIAS 10 Port Router - RB3011UIAS-RM (RouterOS L5, UK PSU) | FAR000075 |
| Monitors Disposal (Gregg, Eric and Emanuele) | |

## Schedule 6: Unsecured Creditor Claims

1. The principal sum of GBP 1,540,000 claimed from the Seller by Mr Ozer pursuant to the terms of the Loan Note Agreement; and

2. The principal sum of USD 26,670,000 claimed from the Seller by Mr Ozer, pursuant to the terms of the 2022 Sale Agreement.

| | |
|---|---|
| Signed by EDWARD BOYLE for and on behalf of LAKE PARIME LIMITED (in administration) as its agent and without personal liability | DocuSigned by: Ed Boyle F84BC9910C3E457... <br> Administrator |
| Signed by EDWARD BOYLE without personal liability and solely for the purpose of obtaining the benefit of the provisions of this contract | DocuSigned by: Ed Boyle F84BC9910C3E457... <br> Administrator |
| Signed by STATAR MINING LTD acting by RON OZER, director | ...................................... <br> Director |
| Signed by RON OZER | ...................................... <br> Ron Ozer |

| | |
|---|---|
| Signed by EDWARD BOYLE for and on behalf of LAKE PARIME LIMITED (in administration) as its agent and without personal liability | ......................................... Administrator |
| Signed by EDWARD BOYLE without personal liability and solely for the purpose of obtaining the benefit of the provisions of this contract | ......................................... Administrator |
| Signed by STATAR MINING LTD acting by RON OZER, director | ......................................... Director |
| Signed by RON OZER | ......................................... Ron Ozer |